This is an appeal from a judgment declaring a deed valid in an action to cancel a conveyance because of the alleged mental incompetency of one of the grantors.
On January 13, 1992, Donna Gladys Stone and her husband, Dowdy Stone, executed a quitclaim deed conveying a rental home that they owned jointly to Dowdy Stone's sister, Ruth Rogers. The deed was prepared by an attorney, James R. Berry, and was signed by the Stones in his presence. Berry asked both grantors a few questions and determined that they were competent to convey the property. Two weeks after executing the deed, Gladys was admitted to Collinsville Nursing Home. Dowdy Stone died on July 7, 1992. On September 29, 1992, Alma Abbott, Gladys Stone's sister, was appointed as Gladys's conservator. Thereafter, Abbott filed this action, seeking to have the conveyance of the rental property to Rogers set *Page 317 
aside, alleging that Gladys had been incompetent and had lacked the capacity to make a valid conveyance of the property.
The trial court ruled that the burden of proof was on Abbott, as the plaintiff, to prove to the satisfaction of the court that Gladys had been incompetent when she signed the deed. The trial court, after hearing ore tenus evidence, held that Abbott had failed to meet that burden, and held that the deed was valid. Abbott appeals.
Initially, we note the "ore tenus rule." Under that rule, when the trial court has heard ore tenus evidence, its judgment based on that evidence is presumed to be correct and will be reversed only if, after consideration of the evidence and all reasonable inferences to be drawn therefrom, the judgment is found to be plainly and palpably wrong. Hoppes v. Kovalchick,576 So.2d 222 (Ala. 1991). We are authorized to reverse the trial court's judgment if it is clearly contrary to the great weight of the evidence. Cagle v. Casey, 405 So.2d 28
(Ala. 1981). We further note, however, that when the facts of the case are undisputed the ore tenus rule has no application and it is the appellate court's duty to determine whether the trial court misapplied the law to the undisputed facts. HomeIndem. Co. v. Reed Equip. Co., 381 So.2d 45 (Ala. 1980).
To void a conveyance on the ground of mental incapacity, the person challenging the transaction must show that the grantor was unable to understand and comprehend what he or she was doing. Thomas v. Neal, 600 So.2d 1000 (Ala. 1992). Mere sickness, weakness of intellect, or advanced age is an insufficient reason to void a conveyance. Rather, the conveyor's mind must have been so impaired that he or she was incapable of acting intelligently and voluntarily during the transaction. Id. Furthermore, it is legally presumed that every person is sane until the contrary is proven. Id.; Hardee v.Hardee, 265 Ala. 669, 93 So.2d 127 (1956). Thus, the burden generally falls upon the person challenging a conveyance to show the incapacity of the grantor "at the very time of the transaction." Wilson v. Wehunt, 631 So.2d 991 (Ala. 1994) (citing, Hall v. Britton, 216 Ala. 265, 267, 113 So. 238, 239
(1927)). See, also, Halman v. Bullard, 261 Ala. 115,73 So.2d 351 (1954).
"But where the person attacking the conveyance shows that the grantor was habitually insane before the conveyance was attempted to be executed, the burden then shifts to those claiming under the conveyance to show that it was made during a lucid interval." Wilson, supra, at 996 (citing, Hardee,265 Ala. at 677, 93 So.2d at 134). Stated another way, proof of insanity before the time of the conveyance does not raise a presumption of insanity at a subsequent time unless it is shown that the insanity is permanent in nature. Halman, supra,261 Ala. at 118, 73 So.2d at 353. Although acts done during a lucid interval are presumed valid, if permanent insanity has been shown rather than mere temporary incompetence or insanity at intervals, there must be clear and convincing evidence showing that there was an intermission of the insanity and that the conveyance proceeded from the unaided volition of the party.Hardee, supra, 265 Ala. at 677, 93 So.2d at 134; Wilson, supra, at 996.
The record reveals that Gladys was 71 at the time of the conveyance on January 13, 1992. Undisputed evidence, both in testimony before the trial court and in the deposition of one of Gladys's doctors, indicated that Gladys had suffered from a mental disorder for some time, and that that disorder had become problematic around 1990. In June 1990, Dowdy Stone filed a petition in the probate court to commit Gladys to a mental institution, based on allegations that Gladys suffered from paranoia, hallucinated, was suspicious, verbalized threats to harm herself, had a very violent temper, and experienced psychotic episodes. The petition further alleged that Gladys's violent temperament had spanned more than 12 months before the filing of the petition and that she had physically attacked others, including her husband, whom, it alleged, she had attacked with a metal rod the day before he filed the petition. The probate court ordered that Gladys be examined by Baptist Medical Center Montclair, in Birmingham, and that the report of her examination be released to the *Page 318 
court. The petition to commit was subsequently dismissed on Dowdy Stone's motion.
On June 13, 1990, Gladys was admitted to Baptist Medical Center, where she was evaluated by a clinical psychologist, Sarah H. Kramer, Ph.D. Dr. Kramer testified that Gladys was confused and had difficulty communicating, but that she attempted to be cooperative. Dr. Kramer performed clinical tests to determine Gladys's mental status. Gladys's performance indicated that she had poor attention, poor concentration, and an inability to comprehend. Her scores on two of the tests showed that she probably suffered from senile dementia and organic problems with brain functioning. Her performance on a memory test, comparable to an IQ test, placed her in the range of "retarded." Dr. Kramer diagnosed Gladys with "probable primary degenerative dementia of the Alzheimer's type with delusions." She testified that this condition is a progressive disease that gets worse and becomes more impairing and that she has never known a patient with this condition to get better. Dr. Kramer stated in her report, "It appears that the patient is unable to care for herself or to make adequate judgments." She testified that, in her opinion, at the time of her evaluation, Gladys would not have been capable of reasonably understanding or executing any document, and that her condition would likely have been worse two years later. She further stated that people with this condition can have periods of lucidity, and that during those periods they are likely to be able to understand simple things, such as who they are, and to recognize the people around them. However, Dr. Kramer stated that in her opinion Gladys would not have had the type of lucidity that would have enabled her to understand complex things such as conveying real estate.
The deposition testimony of psychiatrist Dr. Robert Estock, Gladys's attending physician during her 17-day stay in the hospital, was admitted into evidence. He testified that he observed Gladys almost daily during her hospitalization, and he also diagnosed her with severe Alzheimer's dementia, which he, too, described as a condition that gets progressively worse. He stated that she was severely confused and had difficulty understanding questions and responding appropriately and that, at times, she spoke of her deceased parents as if they were alive. Dr. Estock examined Gladys on other occasions between 1990 and 1992, and found her mental condition unimproved. He testified that, while her mental capacity could fluctuate, her lucid periods would likely only last a few seconds, and not longer than a few minutes. He further stated that, as severe as her condition was, he would not expect for her to experience significant control of her faculties for a substantial period of time. He also stated that he examined Gladys on January 20, 1992, one week after she signed the deed, and that her condition remained unchanged. His opinion was consistent with Dr. Kramer's opinion that Gladys was incapable of understanding or conducting business affairs. When asked whether he believed that she would understand the significance of signing a quitclaim deed to convey property, he answered, "[It is] [h]ighly unlikely that she could comprehend anything that complicated."
Carol Bailey, the assistant director of nursing at Collinsville Nursing Home, also testified. Gladys was admitted to the nursing home on January 27, 1992, and she stayed there until January 1993. Bailey stated that she cared for Gladys for a while after Gladys was first admitted, and that Gladys was generally confused and disoriented. She stated that Gladys was unable to tell the nurses what she needed, and that although she saw Gladys on a daily basis, Gladys failed to recognize her at times.
Donna Davis, an LPN at the nursing home, also testified that she observed Gladys on a daily basis during her stay in the nursing home. She described Gladys as "alert, but confused," and said that Gladys "talked, but . . . wouldn't have really any content to what she was saying." She stated that Gladys was often unable to respond appropriately to questions. She testified that she never saw any improvement in Gladys's condition. Furthermore, the nursing home records that were presented to the trial court contain numerous notations indicating that Gladys was often easily agitated and disoriented, *Page 319 
that she would wander aimlessly, often going into other patients' rooms and disturbing them and their personal belongings, and that she talked incessantly, but that her speech was usually incoherent or irrelevant. There were notations indicating that she was even violent toward other nursing home patients at times, that she was confused regarding contact with her relatives, and that she believed that some of the nursing home staff were her family members.
In addition to that evidence set out above, several family members and neighbors testified regarding the decline in Gladys's mental state. Their testimony indicated that for several years before Gladys was admitted to the nursing home, she had exhibited signs that her mental capacity was diminishing. Her brother and a neighbor testified that Gladys had been unable to recognize them for several years. There was testimony that, on several occasions, Gladys wandered away from home and appeared not to know where she was, and that her husband had built a fence around their house to keep her from wandering off. On at least one occasion, she spoke of having recently seen a friend who had been dead for approximately 30 years. She also repeatedly expressed apparently unfounded fears that her husband was trying to kill her. In short, there was extensive testimony regarding Gladys's memory loss, short attention span, and disorientation. Rogers does not dispute any of this evidence, but emphasizes the statements of one of the nurses, Abbott, and Rogers's son, who all essentially stated that Gladys's condition would vary from day to day.
The only evidence presented that would support the trial court's conclusion that Gladys was competent to make the conveyance was the testimony of James R. Berry, the attorney who prepared the deed conveying the property to Rogers, regarding his observations of Gladys on the day she signed the deed. He estimated that Dowdy and Gladys were in his office for 30 to 45 minutes. He stated that, before they signed the deed, he asked them each a series of questions, including what their names were, what day of the week it was, and whether they knew where they were. He stated that they each answered his questions correctly and that he then read the deed to them and asked whether they knew what they were signing, and that Gladys indicated that she understood. Berry testified that, based on the questions he asked, he "had no reason not to believe that she understood what she was doing."
Despite Berry's testimony regarding Gladys's behavior at the time she signed the deed, we believe that the great weight of the evidence, including the extensive medical evidence introduced regarding Gladys's mental incapacity, which is undisputed, places her in the category of "permanently" or "habitually insane" for the purpose of determining capacity to make a conveyance. Thus, the burden should have fallen on Rogers to show by clear and convincing evidence that Gladys signed the deed during a lucid interval. Wilson, supra, at 996. The trial court indicated in its judgment that it had placed the burden of persuasion on Abbott; in so doing, it misapplied the law to the undisputed facts. This misapplication of the law warrants a reversal. Home Indem. Co. v. Reed Equip. Co., 381 So.2d at 47. We believe the trial court might have reached a different conclusion had it placed the burden of proof on the appropriate party. Therefore, the judgment of the trial court is due to be reversed and the case remanded for the trial court to reconsider the evidence, based on an application of the appropriate burdens of proof.
REVERSED AND REMANDED.
ROBERTSON, P.J., and THIGPEN, J., concur.