CRAWLEY, Judge.
Chris Langley Timber & Management, Inc. (“the buyer”), appeals from a judgment that set aside a Timber Purchase Agreement (“the agreement”) executed by Clayton M. Reynolds (“the seller”). The seller died while the case was pending, and Jamie Reynolds Caldwell, his daughter, as special administrator, represents the seller’s estate.
The trial court granted the estate’s motion for a summary judgment, finding that the seller lacked mental capacity at the time he executed the agreement. This case was transferred to this court by the supreme court, pursuant to § 12-2-7(6), Ala.Code 1975.
Our review of a summary judgment is de novo.
“In reviewing the disposition of a motion for summary judgment, ‘we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,’ Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala.1988), and whether the movant was ‘entitled to a judgment as a matter of law.’ Wright v. Wright, 654 So.2d 542 (Ala.1995); Rule 56(c), Ala. R. Civ. P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such *1095 an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989). Evidence is ‘substantial’ if it is of ‘such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ Wright, 654 So.2d at 543 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala.1993); Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala.1990).”
Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala.1997).
All contracts of an insane person are void. See § 8-1-170, Ala.Code 1975. To prove the seller’s insanity at the time of the execution of the agreement, the estate supported its motion for a summary judgment with the deposition testimony of Dr. Warren T. Jackson HI, a licensed clinical psychologist. On July 30, 2001, more than five months before the seller executed the agreement, Dr. Jackson conducted a psychological/neuropsychology evaluation of the seller. He testified that his diagnostic impression of the seller included dementia similar to that caused by Alzheimer’s disease and alcohol dependence. In his testimony, Dr. Jackson stated:
“A. That’s a reference to one of the tests of memory that he took. It involves reading to the patient two short paragraphs of information and telling them to listen carefully because they’re going to be asked to remember the information and tell it back after we finished reading it to them, and then later upon delay we’ll ask them to recall it again. So we tell them to pay attention. This is a memory test.
“And Mr. Reynolds, although he had some immediate recall of the information, although he performed at the bottom fifth percentile approximately, upon thirty-minute delay, he had no recall whatsoever of that information. And looking back at the test results in preparation for this this morning, it wasn’t just this one measure that he had any recall upon delay. It was also the list-learning tasks and also the tests that involve delayed recall of complex visual information. And it’s very rare in patients that I evaluate, even those with fairly substantial Alzheimer-type dementia, to have no recall like that. It’s a severe impairment.
“Q. Would this type of impairment that you’ve told us — just told us about, Doctor, would that be — based on your education and training and experience, would that be a type of dementia or shortcoming, if it’s fair to call it that, that might improve day to day, might have a good day one day, or is this something that Mr. Reynolds was going to have the rest of his life?
“A. It’s expected to decline over time.
“Q. You wouldn’t expect him to have a good day, then?
“A. Not a good day that would leave him any — other than still impaired. He might remember one word from the list instead of zero, but that would still be extremely impaired.
“Q. I may have done this, Doctor. But if you would, just in general terms — if I have asked you this, I apologize. But tell us what we might expect from a patient that would have this 290.0 dementia of Alzheimer’s type with late onset diagnosis. What would we expect *1096 from that patient, that hypothetical patient?
“A. Generally we think in terms of once an individual has a diagnosis of Alzheimer’s disease, we give them about a six- to eight-year life expectancy. Their course is one of downward decline and cognitive function and onset of a variety of physical difficulties that are related to their increasing lack of mobility. It’s a grave diagnosis with a poor prognosis.-
“Q. Doctor, would you have expected, based on your evaluation of Mr. Reynolds both through the testing process and the interview process, that anytime subsequent to your July the 30th, 2001, report or evaluation that he would have had the capacity to understand and recognize what his estate consisted of?
“A. No.
“Q. Do you think that he would have been able to absorb information at any given time after this July 30, 2001, date to be able to determine independently what he should — what he would like to do with thát property as far as disposition?
“A. Absolutely not. He could not hold on to new information for even up to thirty minutes.
“Q. You say on page three of Plaintiffs 2 that Mr. Reynolds is no longer competent to manage his financial affairs, right at the top of the page. Do you see that, Doctor?
“A. Ido.
“Q. Would your professional opinion be — based on your education, training, and experience and your evaluation of him both through diagnosis testing and interviewing, would you have an opinion whether or not he would be able to make some decision — have the capacity to make some decision in his best interest with regard to contractual matters?
“A. At the time I saw him, I didn’t feel like he was able to make or communicate responsible decisions involving his affairs.
“Q. And would your testimony be the same here as it was when I asked you before? That based on those things, your education experience, your diagnostic testing, your interview with him, that he would not have improved from that date forward?
“A. That’s correct. He’s expected to decline. And I would emphasize to the Court that this was not a borderline case. This was considered a very substantial find, and it was not a hard call to make with his test data.
“[Plaintiffs attorney]: Give me just minute. (Recess taken.)
“Q.... Would a person who has this diagnosis, such as Mr. Reynolds, ... be susceptible to influence from — on his day-to-day decision-making from his care taker?
[[Image here]]
“A. In general, all patients with dementia are and become very dependent on their care givers.
“Q. And would you expect that to be the case with Mr. Reynolds?
“A. Yes, and increasingly so over time.
[[Image here]]
“Q. Did you find that Mr. Reynolds was suffering from some type of permanent insanity?
“A. He had Alzheimer’s dementia. Insanity is a term that we don’t use as much in mental health these days. But in a word, yes.
“Q. And how is that?
“A. Alzheimer’s dementia is expected to decline over time. Individuals lose *1097 their ability to remember or participate in the life of their family. They often have behavioral difficulties, including paranoia and agitation, wondering and aggressiveness.
[[Image here]]
“Q. Now, clearly, you weren’t present on May 2, 2002, when Mr. Reynolds executed a will?
“A. That’s correct.
“Q. In all frankness, Doctor, [you] couldn’t really tell us whether he was having a good day or a bad day on May 2, 2002, could you?
“A. Well, other than within the context of his Alzheimer’s, which should have been worse by about eight months or so. He couldn’t do that when I saw him on July 30th of '01.1 don’t see how he could have done it at any time after that.
“Q. On July 30, 2001, did you ask Mr. Reynolds to tell you what property he owned?
“A. I did not.
“Q. And is your testimony, then, that you don’t believe Mr. Reynolds could verbalize what property he owned?
“A. That’s correct. An example, it’s not about property per se, but he told me that two weeks prior to our interview he had flown an ultralight airplane, which alarmed me. And then I ran by Ms. Baran [daughter] and Ms. Hayes [care taker], and they said no. It had been many months since he did it. And to me, that told me that he really doesn’t know what he remembers or knows and is capable of saying or thinking anything.
[[Image here]]
“Q. You mentioned that insanity is a word you don’t use much in your occupation much anymore. What does ‘insanity’ mean?
“A. Severe mental illness.”
(Emphasis added.)
The evaluation was attached to Dr. Jackson’s deposition; it stated, in part:
“Upon assessment of language functioning, there emerged no evidence of receptive or expressive aphasia. There was no clear deficit in confrontation naming and his ability to rapidly produce spoken words upon command according to a specific phonemic category was average. Immediate and delayed recall of narrative verbal information (short stories) was quite poor. Remarkable was complete lack of retention upon delayed recall. No spontaneous confabulation was noted. On a higher-level test of verbal learning and memory requiring immediate and delayed recall of items from a word list, Mr. Reynolds demonstrated a highly attenuated learning curve reflecting a greatly reduced capacity to store information in memory. He produced no list items upon immediate and delayed free recall and semantic cueing was only slightly helpful. Recognition memory performance was also quite poor and notable was a tendency to make numerous false positive responses. Delayed recall of complex visual information was comparably impaired.
“Upon direct drawing reproduction of a complex graphic figure, Mr. Reynolds demonstrated mild motor dyscontrol as well as poor spatial planning and construction difficulty. There was no clear evidence of a primary visual-perceptual defect. On a higher-level test of nonverbal reasoning requiring development and implementation of problem-solving strategies based on examiner feedback, Mr. Reynolds made numerous errors compared to other people his age and education level (bottom 5th le). His mental flexibility was very poor and he tended to persist in making the same *1098 error even when given direct examiner feedback about his performance.
. [The seller] is no longer competent to manage his financial affairs.”
(Emphasis added.)
Dr. Jackson’s testimony and evaluation established that the seller’s impaired mental condition was permanent; that he could not absorb information; that he could not hold on to new information for 30 minutes; that he could not make or communicate responsible decisions involving his affairs; that he did not know what he remembered or knew and was capable of saying or thinking anything; that his delayed recall of complex visual information was impaired; and that he was no longer competent to manage his financial affairs.
This evidence was sufficient to shift the burden of proof to the buyer to demonstrate that the agreement was executed during a lucid interval. See Hardee v. Hardee, 265 Ala. 669, 93 So.2d 127 (1956). To meet its burden, the buyer filed affidavits from several persons who either negotiated the terms of the agreement or were present at the time of the execution of the agreement.
Chris Langley, the buyer’s owner, stated:
“A few weeks later I called Mr. Reynolds back and arranged to meet him again to discuss prices for the timber. He remembered who I was and invited me out to his house again. On this occasion, Mr. Reynolds and I reached an agreement about the timber.... The prices I prepared were based on market prices for various types of timber at that time. I showed this list to Mr. Reynolds and he agreed to sell the wood for those prices. A copy of the list I gave to Mr. Reynolds is attached to this affidavit. We shook hands and I left.
“During my first meeting with Mr. Reynolds, he told me that one of his daughters] had a power of attorney for him and that he had seen a psychologist, Dr. Warren Jackson, in Birmingham the past summer. He gave me a copy of Dr. Jackson’s ‘Psyehological/N europsycho-logical Evaluation’ dated July 30, 2001. Mr. Reynolds told me not to worry about his daughter or Dr. Jackson. He said that he was in good shape, the wood was his and he wanted to sell it.
“Mr. Reynolds did not do or say anything that made me think he was not capable of selling his timber, but I contacted attorney Shane Cooper to see if Mr. Reynolds could execute a deed under those circumstances and to do the title search and prepare the timber deeds.
[[Image here]]
“During the conversations and meetings I had with Mr. Reynolds, I never got the impression that he did not understand that he owned land or that he did not want to sell his timber. He initiated the first contact with me about selling the timber and then took me straight to it and showed me exactly where each property was located. On February 11, 2002, Mr. Reynolds arrived at the lawyer’s office on time, he said more than once that he understood what he was doing and signed the deeds.”
Josh Phillips, the buyer’s agent, stated:
“Sometime in late 2001, either November or December, I went with Chris Langley to Mr. Clayton Reynolds’ house....
“Not long after this, maybe two weeks later, still in 2001, I had to go to Nota-sulga for other business and Chris asked me to stop in and let Mr. Reynolds know that he was working on prices for the timber. After I told him that, Mr. Reynolds said that was good, just to get *1099 it to him as quick as we could. I got the impression that Mr. Reynolds was still interested in selling the timber. I stayed at Mr. Reynolds’ house about fifteen minutes just chatting with him....
“I did not see or talk to Mr. Reynolds again after that. During the two times I did see Mr. Reynolds, it never occurred to me that something might be wrong with him mentally, other than just being old; if anything I thought he seemed very set in his ways the way elderly people sometimes are. He seemed very aware of what property belonged to him and that he wanted to sell the timber on it.”
Melinda Eubanks, the attorney’s employee, stated:
“On February 11, 2002, I was present when an elderly man came to Mr. Cooper’s office to sign some deeds.... I remember that the whole point of my being present was to watch this man to see if he understood what he was signing.
“... I do not remember Mr. Cooper having to go back and explain anything to him and I do not remember the man answering or saying anything which was not correct or which made me think he was confused about what he was doing.
[[Image here]]
“My impression of the man was that he was just old and maybe a little hard of hearing. But everything he said and did and the way he talked to Mr. Cooper led me to believe he understood he was going to sign a timber deed and it appeared to me that signing the deed is what he wanted to do. I really did not notice anything unusual about Mr. Reynolds’ behavior that day. He was alert and seemed to fully comprehend what he was doing.”
Only the first page of the agreement dated January 8, 2002, was included in the record; it stated, in part:
“The seller agrees to the said prices:
“Pine Pulpwood is to be paid @ $20.00 per cord — 5850 lbs weight factor
“Hardwood Pulpwood is to be paid @ $20.00 per cord — 5650 lbs weight factor
“Pine Logs are to be paid @ $220.00 per thousand feet — 15,000 lbs weight factor
“Pine C/N/S is to be paid @ $150.00 per thousand feet — 15,000 lbs weight factor
“Oak Logs are to be paid @ $150.00 per thousand feet — 16,000 lbs weight factor
“Poplar Logs are to be paid @ $200.00 per thousand feet — 16,000 lbs weight factor
“Gum Logs are to be paid @ $80.00 per thousand feet — 16,000 lbs weight factor”
The buyer’s evidence sufficiently rebutted the estate’s evidence of the seller’s inability to recall established facts such as: directions to his home, the location and boundaries of his farm, the reason for selling his timber, and his children’s objection to the sale. However, such proof does not sufficiently rebut Dr. Jackson’s evaluation indicating that the seller had no delayed recall of new information. Dr. Jackson described this condition as a severe impairment. The consideration for purchasing the timber was not for an amount certain; rather, it was based on seven categories of logs, at different prices (two categories paid by the cord, five categories paid by the thousand board feet), and four different weight factors. This pricing schedule presented complex visual information to the seller. Dr. Jackson testified that the seller’s delayed recall of such *1100 information was impaired and that the seller absolutely could not absorb information and be able to determine independently how he would like to dispose of his property-
In addition to the terms listed on the first page of the agreement, the seller and the buyer could have agreed to other matters — for instance, the time period for cutting, the size and species of the trees to be left or the alternative of clear cutting, the method of payment, and perhaps the condition of fencing and roads after cutting, the areas not to be cut, and the methods of clearing and reforestation after cutting. These terms, if included in the agreement, likewise, based upon the testimony of Dr. Jackson, could not have been understood by the seller. Declarations of a person, whose mental capacity is at issue, and witnesses’ impressions of normalcy did not rebut Dr. Jackson’s medical diagnosis as to the seller’s inability to absorb new information or to make responsible decisions involving his affairs.
Based upon the foregoing, we conclude that there was undisputed evidence supporting the estate’s contention that the seller lacked the mental capacity to enter into the agreement and that the trial court therefore did not err by entering a summary judgment in favor of the estate.
AFFIRMED.
YATES, P.J., and THOMPSON and PITTMAN, JJ., concur.
MURDOCK, J., dissents, with writing.