Jamie Reynolds Caldwell, as special administrator for the estate of her deceased father, Clayton M. Reynolds, brought a declaratory-judgment action against Chris Langley Timber 
Management, Inc. ("Langley Timber"), seeking to set aside *Page 1102 
timber deeds executed by Reynolds in favor of Langley Timber. The trial court, finding that Reynolds lacked the mental capacity to execute the timber deeds, entered a summary judgment setting aside the deeds. Langley Timber appealed to the Court of Civil Appeals. The Court of Civil Appeals affirmed the trial court's summary judgment. Chris Langley Timber Management, Inc. v.Reynolds, 923 So.2d 1094 (Ala.Civ.App. 2004). We granted Langley Timber's petition for certiorari review to consider whether in affirming the trial court's summary judgment the Court of Civil Appeals erred by shifting the burden to Langley Timber to prove that Reynolds had capacity to execute the timber deeds, contrary to the accepted standard for proving insanity as the ground for voiding a deed.[1] We reverse and remand.
On July 30, 2001, two days after being released from a long-term-care hospital to recover from heart surgery, Clayton M. Reynolds was evaluated by a clinical psychologist, Dr. Warren T. Jackson III. Reynolds took a day-long battery of memory tests, which consisted of Dr. Jackson's reading new material to Reynolds and presenting Reynolds with lists of information, and then testing Reynolds's ability to recall the new information. At the time of the evaluation, Reynolds was taking at least two medications that, according to Dr. Jackson's deposition testimony, can affect memory. Reynolds did not perform well on the tests. Based on an interview and the results of the tests, Dr. Jackson concluded that Reynolds was suffering from Alzheimer's type dementia.
In November 2001, Reynolds initiated contact with Chris Langley by telephone. Chris Langley owned Langley Timber, a logging business. During their telephone conversation, Reynolds told Langley that he owned two tracts of land totaling over 400 acres, one in Macon County and one in Tallapoosa County, and that he wanted to harvest the timber on the land. Reynolds and Langley agreed to meet, and Reynolds provided Langley with directions to Reynolds's house.
In late November or early December 2001, Langley and Josh Phillips, an employee of Langley Timber, met with Reynolds for the first time at Reynolds's house. After having breakfast at Reynolds's house, the three men got into Langley's truck and Reynolds directed Langley to the land in Macon County and Tallapoosa County from which he wanted to harvest timber. At both locations, Reynolds got out of the truck, unlocked and opened gates when necessary, and showed Langley the landmarks by which Langley's crew could locate the boundary lines of each parcel. Reynolds showed Langley the boundary lines of a parcel of the Macon County land that had been cut out of the larger parcel and given to one of his daughters.
Reynolds told Langley during this first meeting that one of his daughters held his power of attorney and that he had seen a psychologist after he had had heart surgery the previous summer. Reynolds provided Langley with a copy of the power of attorney and a copy of Dr. Jackson's July 2001 psychological evaluation. Nonetheless, Reynolds assured Langley that Langley should not worry about his daughter or *Page 1103 
the doctor because Reynolds was "in good shape." Reynolds also assured Langley that the timber belonged to Reynolds and that he wanted to sell it.
The following week, when Phillips was running errands in Notasulga, he stopped by Reynolds's house to let Reynolds know that Langley was working on a price sheet for the timber. Reynolds responded that that was good, and he told Phillips to get the price sheet to him as soon as possible. Phillips "chatted" with Reynolds for about 15 minutes. During this time, Reynolds took Phillips to the barn and showed him an ultralight plane he owned.
Shortly thereafter Langley telephoned Reynolds to arrange another meeting at Reynolds's house. During this meeting, Langley and Reynolds reached an agreement whereby Langley would cut and remove the timber and pay Reynolds for the timber once it was delivered to the lumberyard. Langley provided Reynolds with a list of prices he was willing to pay for the timber and Reynolds accepted the prices. The two men shook hands on their agreement.
Langley contacted an attorney, Shane Cooper,[2] to determine whether Reynolds could legally execute timber deeds under the circumstances and, if he could, to conduct a title search and to prepare timber deeds for Reynolds to execute. Langley gave Cooper a copy of the power of attorney Reynolds had executed in favor of his daughter and the psychologist's evaluation Reynolds had given him and described to Cooper his dealings with Reynolds. Cooper conducted a title search, which confirmed that Reynolds in fact owned the land he claimed to own and that Reynolds had, as he had told Langley, previously deeded a portion of the Macon County property to his daughter. Cooper also checked with the probate court to determine whether any petition for guardianship or conservatorship over Reynolds had been filed; none was pending at that time. Apparently concluding that Reynolds could legally execute the timber deeds, Cooper prepared them.
On February 11, 2002, Reynolds, accompanied by Diane Hayes,[3] drove to Cooper's office in Auburn to execute the timber deeds. Reynolds conversed with Cooper for approximately 30 minutes in the presence of Hayes, Langley, and Melinda Eubanks, Cooper's employee. Reynolds stated that he owned real property in Macon County and Tallapoosa County, that he wanted to sell the timber on the property, that he had contacted a logger who had agreed to pay him for the timber, and that he wanted to sign the timber deeds. Cooper also had a private conversation with Reynolds, in which Cooper confirmed that Reynolds understood what he was doing and that he was not being influenced by anyone. Reynolds told Cooper that his children were not pleased that he was selling the timber but that he wanted to sell it nonetheless. Once again in the presence of Langley, Hayes, and Eubanks, Cooper asked Reynolds if he understood that he was signing timber deeds, which meant the timber on his land in Macon County and Tallapoosa County would be cut. Reynolds responded that he understood and that he wanted to proceed. Reynolds flipped through the pages of the two deeds, looking at each one for a moment, and signed the two deeds, without *Page 1104 
assistance, in the presence of a notary public.
In May 2002, Reynolds's daughters, Jamie Reynolds Caldwell and Paula Reynolds Baran, filed this declaratory-judgment action in the Tallapoosa Circuit Court seeking to set aside the timber deeds executed by Reynolds on the ground that he lacked capacity to execute them.[4] While the case was pending, Reynolds died. Caldwell was appointed special administrator over Reynolds's estate and was substituted as the proper party in this case. In the declaratory-judgment proceeding, the estate moved for a summary judgment, arguing that there was no genuine issue of material fact as to Reynolds's capacity to execute the deeds. The estate supported its summary-judgment motion with the deposition testimony of Dr. Warren T. Jackson III, the licensed clinical psychologist who had examined Reynolds six months before the execution of the timber deeds, and with Dr. Jackson's July 2001 evaluation.
Langley Timber opposed the summary-judgment motion and supported its opposition with affidavits from Langley, Phillips, and Eubanks. The affidavits essentially set forth the events surrounding the negotiation of the sale of the timber and the execution of the timber deeds. The affidavits also stated the affiants' impressions that Reynolds knew exactly what he was doing during the negotiation of the timber sale and at the closing of the sale when he executed the timber deeds. After a hearing in which no oral testimony was heard, the trial court found that Reynolds had lacked the capacity to execute the deeds because he was mentally incompetent when he executed the deeds. The trial court entered a summary judgment in favor of the estate and set aside the timber deeds.
Langley Timber appealed to this Court. We transferred the case to the Court of Civil Appeals pursuant to § 12-2-7(6), Ala. Code 1975. The Court of Civil Appeals affirmed the trial court's judgment.[5] Chris Langley Timber Mgmt., Inc. v.Reynolds, 923 So.2d 1094 (Ala.Civ.App. 2004). Langley Timber petitioned this Court for the writ of certiorari. We granted certiorari review to consider whether the Court of Civil Appeals erred in affirming the trial court's summary judgment by shifting to Langley Timber the burden of proof of Reynolds's capacity to execute the timber deeds, contrary to the requirements of the accepted standard for proving insanity as the ground for voiding a deed.
Our review of a summary judgment is de novo.
 "In reviewing the disposition of a motion for summary judgment, `we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,' Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988), and whether the movant was `entitled to a judgment as a matter of law.' Wright v. Wright, 654 So.2d 542
(Ala. 1995); Rule 56(c), Ala. R. Civ. P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of *Page 1105 Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Evidence is `substantial' if it is of `such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' Wright, 654 So.2d at 543 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala. 1993); Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala. 1990)."
Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala. 1997).
The test for insanity as the ground for voiding a deed is whether the grantor "`"had sufficient capacity to understand in a reasonable manner the nature and effect of the act which he was doing."'" Wilson v. Wehunt, 631 So.2d 991, 996 (Ala. 1994) (quoting Hall v. Britton, 216 Ala. 265, 267, 113 So. 238, 239
(1927), quoting in turn 18 C.J. 218, § 131); see also McAlisterv. Deatherage, 523 So.2d 387, 388 (Ala. 1988), and Weaver v.Carothers, 228 Ala. 157, 153 So. 201 (1934). In order to render a deed void, the burden of proof is on the party attacking the conveyance to show the incapacity of the grantor at the time the conveyance is made. Abbott v. Rogers, 680 So.2d 315, 317
(Ala.Civ.App. 1996). However, insanity existing before the time of the conveyance will raise a presumption of insanity at the time of the conveyance if it is shown that the insanity is permanent in its nature.[6] Abbott, 680 So.2d at 317
(citing Wilson, 631 So.2d at 996); see also Pritchard v.Fowler, 171 Ala. 662, 672, 55 So. 147, 149 (1911). If the party challenging the conveyance establishes that the grantor suffers from a permanent type of insanity, then the burden shifts to the party defending the conveyance to show that the transaction occurred during a lucid interval. Wilson, 631 So.2d at 996.
The Court of Civil Appeals impliedly held that Reynolds's Alzheimer's disease constituted "permanent insanity":
 "Dr. Jackson's testimony and evaluation established that [Reynolds's] impaired mental condition was permanent; that [Reynolds] could not absorb information; that [Reynolds] could not hold on to new information for 30 minutes; that [Reynolds] could not make or communicate responsible decisions involving his affairs; that [Reynolds] did not know what he remembered or knew and was capable of saying or thinking anything; that [Reynolds's] delayed recall of complex visual information was impaired; and that [Reynolds] was no longer competent to manage his financial affairs."
923 So.2d at 1098. The Court of Civil Appeals held that the evidence presented by Dr. Jackson's testimony and his evaluation "was sufficient to shift the burden of proof to [Langley Timber] to demonstrate that the [timber deeds were] executed during a lucid interval." 923 So.2d at 1098.[7] *Page 1106 
This shifting of the burden would be correct if the estate established that Reynolds was permanently insane. See Abbott,680 So.2d at 317. While it may be apparent that the dementia caused by Reynolds's Alzheimer's disease was "permanent" in nature as distinguished from temporary,[8] it is not so apparent that the state of Reynolds's dementia constituted "insanity" as that term is used to describe the mental incapacity necessary to justify the avoidance of a contract or a deed.
To determine whether Reynolds's dementia amounted to insanity so as to render the timber deeds void, the proper inquiry is whether the Alzheimer's dementia permanently deprived Reynolds of "`"sufficient capacity to understand in a reasonable manner the nature and effect of"'" his signing the timber deeds. SeeWilson, 631 So.2d at 996. We cannot agree with the Court of Civil Appeals' conclusion that Dr. Jackson's testimony and his evaluation of Reynolds established that there was no genuine issue of material fact as to whether the dementia caused by Reynolds's Alzheimer's disease constituted permanent insanity and, therefore, shifted the burden of proof to Langley Timber to prove that Reynolds signed the timber deeds during a lucid interval.[9]
The testimony of Dr. Jackson describes the tests Reynolds took as involving
 "reading to the patient two short paragraphs of information and telling them to listen carefully because they're going to be asked to remember the information and tell it back after we finished reading it to them, and then later upon delay we'll ask them to recall it again. So we tell them to pay attention. This is a memory test."
Dr. Jackson testified in his deposition that Reynolds had had some recall of the information but that he had "had no recall whatsoever of that information" after a 30-minute delay. Reynolds had had similar problems with "list-learning tasks" and "tests that involve delayed recall of complex visual information." Dr. Jackson testified that it was rare even in "those with fairly substantial Alzheimer-type dementia, to have no recall like that." When deposing counsel asked Dr. Jackson if, based on the July 2001 evaluation, Dr. Jackson believed that Reynolds would have thereafter had the capacity to understand and recognize the contents of his estate, Dr. Jackson replied "No." When asked if, after seeing the results of the July 2001 evaluation, he thought that Reynolds would thereafter be able to "determine independently what he should — what he would like to do with that property as far as disposition," Dr. Jackson replied: *Page 1107 
 "A. Absolutely not. He could not hold on to new information for even up to 30 minutes."
It is not clear how severe short-term memory loss, which is all that Dr. Jackson's testimony appears to establish Reynolds suffered from, demonstrates that Reynolds was unable to "understand in a reasonable manner the nature and effect of" executing the timber deeds.[10] See Wilson,631 So.2d at 996. We recognize that the ultimate conclusion of Dr. Jackson's July 2001 evaluation appears to be that Reynolds was "no longer competent to manage his financial affairs." However, given the questionable basis for Dr. Jackson's conclusions (Reynolds's deficient short-term memory), the evidence with which Langley Timber responded to the estate's summary-judgment motion is substantial; it is of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer from it that Reynolds was able to understand in a reasonable manner the nature and effect of his signing the timber deeds. See Hobson v. American Cast Iron Pipe Co.,690 So.2d at 344 ("When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. . . . Evidence is `substantial' if it is of `such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" (quoting West v. Founders Life Assurance Co. ofFlorida, 547 So.2d 870, 871 (Ala. 1989)).
Langley Timber presented an affidavit of Chris Langley setting forth his dealings with Reynolds regarding the sale of the timber, an affidavit of Josh Phillips describing his encounters with Reynolds, an affidavit of Shane Cooper describing his observations of Reynolds,[11] and an affidavit of Melinda Eubanks describing Reynolds's behavior when he signed the deeds. Those affidavits all indicate that Reynolds knew what he was doing during the negotiation of the timber sale and when he executed of the timber deeds.
The Court of Civil Appeals concluded that these affidavits did rebut the estate's evidence of Reynolds's "inability to recall established facts such as: directions to his home, the location and boundaries of his farm, the reason for selling his timber, and his children's objection to the sale"; the Court of Civil Appeals nonetheless held that that evidence did not sufficiently rebut Dr. Jackson's evaluation that Reynolds "had no delayed recall of information." However, Reynolds's ability to recall the location and boundaries of the land on which the timber was located, including the boundary of the parcel he had given to one of his daughters, to recall his reason for selling the timber, and to recall the fact that his children objected to the sale of the timber certainly appears to be more indicative of Reynolds's capacity to execute the timber deeds than is Reynolds's inability to recall lists of new information while he was on medication that might have affected his memory.[12] *Page 1108 
The Court of Civil Appeals also stated as follows regarding the affidavits presented by Langley Timber:
 "Declarations of a person, whose mental capacity is at issue, and witnesses' impressions of normalcy did not rebut Dr. Jackson's medical diagnosis as to [Reynolds's] inability to absorb new information or to make responsible decisions involving his affairs."
923 So.2d at 1100.
However, a psychologist's conclusions are not irrebutable by lay testimony. See Lackey v. State, 615 So.2d 145 (Ala.Crim.App. 1992) ("`"Expert testimony, even when uncontradicted, is not conclusive on the issue of [competency], . . . and the jury may find such testimony adequately rebutted by the observations of mere laymen."'" (quoting Ellis v. State, 570 So.2d 744, 752
(Ala.Crim.App. 1990), quoting in turn United States v. Mota,598 F.2d 995, 999 (5th Cir. 1979), and citing Greider v.Duckworth, 701 F.2d 1228, 1234 (7th Cir. 1983)).
Viewing all of the evidence in a light most favorable to Langley Timber, the party opposing the summary-judgment motion, we conclude that the evidence offered by Langley Timber was substantial and that it created a genuine issue of material fact as to whether Reynolds had the capacity to execute the timber deeds. The trial court erred in entering a summary judgment, and the Court of Civil Appeals erred in affirming the trial court's judgment. We reverse the judgment of the Court of Civil Appeals and remand the cause to that court for proceedings consistent with this opinion.
REVERSED AND REMANDED.
NABERS, C.J., and LYONS, HARWOOD, STUART, SMITH, and BOLIN, JJ., concur.
PARKER, J., concurs in the result.
[1] The Court of Civil Appeals' opinion indicates that the trial court's judgment set aside a "Timber Purchase Agreement."923 So.2d at 1094. However, the trial court's judgment does not refer to any contract or agreement but states that "Reynolds lacked capacity to execute the timber deed[s]. . . . Accordingly, . . . the timber deed[s] [are] hereby set aside and held to be legally void."
[2] It is not clear from the record whether Langley contacted Shane Cooper after his first or after his second meeting with Reynolds. Cooper is Langley Timber's counsel on appeal.
[3] Diane Hayes is described in the record as Reynolds's "girlfriend/companion."
[4] On June 11, 2002, Reynolds's daughters were appointed co-conservators over Reynolds, and Diane Hayes was appointed as his guardian. The guardianship/conservatorship proceedings began in December 2001.
[5] Judge Murdock dissented, stating: "Based on the record before this court, I conclude that this case was not an appropriate case for summary judgment." 923 So.2d at 1100.
[6] In contrast, "proof of insanity at intervals or of a temporary character would create no presumption that it continued up to the execution of the instrument, and the burden would be upon the attacking party to show insanity at the very time of the transaction." Pritchard v. Fowler, 171 Ala. 662, 672,55 So. 147, 149 (1911).
[7] In support of this conclusion, the Court of Civil Appeals cites Hardee v. Hardee, 265 Ala. 669, 678, 93 So.2d 127, 134
(1957), in which this Court, without explanation, shifted the burden to the party defending the conveyance, although it expressed "some doubt as to whether or not [the doctor's] testimony should be construed as showing that [the grantor] suffered from permanent insanity."
[8] The caselaw contrasts permanent insanity, also called "habitual insanity," with "temporary incompetence," Abbott,680 So.2d at 317; "insanity at intervals," Abbott,680 So.2d at 317, Hall, 216 Ala. at 267, 113 So. at 239, and Pritchard,171 Ala. at 672, 55 So. at 149; and "insanity of a temporary character," Hall, 216 Ala. at 267, 113 So. at 239, andPritchard, 171 Ala. at 672, 55 So. at 149.
[9] Because we hold that there is a genuine issue of material fact as to whether Reynolds's dementia amounted to permanent insanity, the burden could not, on the estate's summary-judgment motion, shift to Langley Timber to show that Reynolds executed the timber deeds during a lucid interval. Instead, the burden stayed with the estate to show that Reynolds lacked capacity at the time he executed the timber deed. See Abbott,680 So.2d at 317. Langley Timber's evidence created a genuine issue of material fact as to that question. The relevant inquiry remains whether at the time Reynolds executed the timber deeds, he had sufficient capacity to understand in a reasonable manner the nature and effect of executing those timber deeds. Wilson,631 So.2d at 996.
[10] We note that the Court of Civil Appeals' opinion does not mention that on the day Dr. Jackson administered the tests and prepared his evaluation, Reynolds was taking medication, one of the side effects of which was memory loss.
[11] Attached to Cooper's affidavit is a transcript of a conversation that took place between Cooper and Reynolds on the day the timber deeds were executed and in which Cooper apparently sought to confirm Reynolds's capacity to execute the deeds.
[12] The Court of Civil Appeals also expressed concern that the pricing schedule Langley submitted to Reynolds constituted "complex visual information" and that Dr. Jackson had established that Reynolds's delayed recall of such information was impaired. This is a legitimate concern for the finder of fact; however, the capacity required to execute a deed does not require that one be able to recall the detailed price terms of the contract. Instead, he must "understand in a reasonable manner the nature and effect of the act which he was doing." See Wilson,631 So.2d at 996.