STUART, Justice.
This is the third time the dispute between these parties has been before this Court. See Ex parte Queen, 959 So.2d 620 (Ala.2006), and Queen v. Belcher, 888 So.2d 472 (Ala.2003). In this latest iteration, Brent Belcher appeals the judgment of the trial court holding that Olon Belcher, the father of the appellant Brent and of the appellees Bettye Jan Queen, Beverly Jean Scroggins, and Otha A. Belcher, was incompetent when he executed: (1) a December 1995 durable power of attorney appointing Brent to be his attorney-in-fact; (2) a December 1995 partnership agreement creating Olon Belcher Properties, Ltd., a partnership between Olon, his wife Hazel Belcher, and Brent; and (3) a March 1998 document creating a revocable trust and naming Brent as the trustee (these documents are hereinafter referred to collectively as “the planning documents”). The trial court accordingly declared each of the planning documents void. Olon Belcher Properties, Ltd., appeals the denial of its motion to intervene, after the trial court entered its judgment declaring the partnership agreement void. We affirm in part and reverse in part.
In Queen, Olon’s children Queen, Scrog-gins, and Otha were collectively referred to as “the petitioning children” because they initiated the case by petitioning the Probate Court of Bibb County to appoint a conservator for Olon. 888 So.2d at 474. In Ex parte Queen, they were again referred to collectively as “the petitioning children” because they were petitioning this Court for a writ of mandamus. 959 So.2d at 620. Therefore, in the interest-of consistency, they are again referred to as “the petitioning children” in this opinion.[1]
I.
In Queen, we set forth the facts at the root of this dispute:
“On June 15, 2000, the petitioning children petitioned the Probate Court of Bibb County to have a conservator appointed for their father because of his diminishing mental capacity and because of concern about the way their brother Brent was handling his estate. On February. 9, 2001, the probate judge granted the petition, concluding that Olon ‘is a person unable to manage property and business affairs effectively as described in [§ 26-2A-130, Ala.Code 1975].’ The order also, required Brent to produce the 1998 trust agreement and to make an accounting of that trust. Sanford E. Gunter was appointed conservator of Olon’s estate.
“Brent immediately removed the con-servatorship to the Bibb Circuit Court and, in June 2001, moved the court to ■issue an order: (1) adopting the ‘Plan for Joint Care of Olon Belcher’ Brent had submitted, (2) directing the conservator to work with the instruments of Olon’s estate already in effect (the durable power of attorney, the partnership agreement, and the trust agreement), and (3) setting June 15, 2000, the date the petitioning children filed their petition for a conservator, as the effective date for the appointment of a conserva *1026 tor. The petitioning children opposed Brent’s motion and moved the court to compel Brent to comply with the provisions of the probate court’s February 9 order that required him to produce the 1998 trust agreement and to make an accounting of that trust. They further asked the court to find that Olon had been incapable of managing his business affairs since 1994, and that, therefore, he did not have the capacity in 1995 to execute the power of attorney or the partnership agreement or subsequently in 1998 to execute the trust agreement and that those documents were therefore invalid. On July 26, 2001, the trial court ruled that Brent did not have to comply with the provisions of the probate court’s order requiring him to produce the trust agreement and to make an accounting of the trust, but it did not address the other pending issues.
“Meanwhile, on October 16, 2001, the court-appointed conservator filed his inventory of Olon’s estate. After listing Olon’s then current assets and liabilities, he noted numerous transactions in which Brent had been involved that the conservator had not investigated, and he asked the court to clarify the scope of his responsibility, stating:
“ ‘Numerous transactions have occurred over the past years, including liabilities such as that of Belcher Oil Co., Inc. The Conservator has not investigated any transfer as to the issues of fair market value paid or received; proration of interest versus value of contribution; amount and necessity of payouts or withdrawals; potential for conflict of interest issues wherein Brent Belcher serves as Power of Attorney, trustee, Manager, President or Director of Corporation all wherein the ward, Olon Belcher, has an interest therein.
“ ‘The Conservator would determine that under § 26-2A-152, et seq., he has no authority to visit these issues without the Court, per § 26-2A-154, enlarging the Conservator’s power.’
“The trial court scheduled a hearing for December 17, 2001, to determine when Olon became incapable of effectively managing his property and his business affairs. At the hearing, the petitioning children presented deposition testimony from three doctors in support of their contention that Olon was incapable of effectively managing his property and business affairs at least as early as 1995, when he executed the power of attorney in favor of Brent. They asked the court to invalidate the power of attorney, the partnership agreement, and the trust agreement, and to order a full accounting of the estate from 1995 to the present.
“In response, Brent presented six affidavits from witnesses who knew Olon in varying degrees, both personally and in business settings, and who swore that Olon had appeared lucid and intelligent during business interactions they had had with him at different times between 1993 and 2000. Brent also presented evidence indicating that the petitioning children had benefited as well from transactions with Olon during this period. The petitioning children moved to strike the affidavits as hearsay.
“On May 13, 2002, the court denied the petitioning children’s motion to strike the affidavits and found that Olon had the legal capacity to execute the power of attorney and the partnership agreement in 1995 and the trust agreement in 1998. The court denied the petitioning children’s request for an accounting of the estate and ordered that the conservator manage the estate to reflect the validity of all the documents *1027 executed by Olon before the conservator was appointed.”
888 So.2d at 474-75. We subsequently reversed the trial court’s judgment, holding that the trial court erred by considering the affidavits submitted by Brent, which we concluded were hearsay. We remanded the cause for the trial court “to determine whether Olon Belcher was competent to execute the power of attorney and to enter into the partnership agreement and the trust agreement.” 888 So.2d at 478.
On remand, the petitioning children moved the trial court to enter a judgment on Olon’s competency based upon the valid evidence it had received at the December 17, 2001, evidentiary hearing; however, after the trial court denied that motion and instead ordered a new evidentiary hearing, the petitioning children sought mandamus relief in this Court. In Ex parte Queen, we granted mandamus relief to the petitioning children and directed the trial court to rule on the competency issue based on the existing evidence. 959 So.2d at 628. On August 8, 2007, the trial court entered the following order deciding the issue:
“The Supreme Court in its ruling found this court erred and exceeded its discretion by allowing into evidence and considering certain affidavits offered by Brent Belcher. This court accepts the opinion of the Court and now considers only the evidence properly in the record and nothing more. Therefore, based on the evidence in the record and applying the standard applicable to determining the validity of the power of attorney, partnership agreement, and trust agreement (and not the standard for testamentary capacity) this court finds that Olon Belcher was unable to understand and comprehend what he was doing at the time he signed the power of attorney, partnership agreement, and trust agreement.
“All documents made the subject of this litigation are, therefore, declared invalid, void, and of no effect.”
On September 7, 2007, Brent moved the trial court to alter, amend, or vacate its order, arguing that the petitioning children had not met their burden and that, even if they had, the trial court had still erred by declaring the partnership agreement void. That same day, Olon Belcher Properties moved to intervene, arguing that the entire partnership agreement should not be declared void on the basis that one out of the three partners was incompetent at the time the partners entered into the agreement. Following a hearing, the trial court denied both' the postjudgment and intervention motions; Brent and Olon Belcher Properties then filed this appeal.
II.
In Queen, we applied a de novo standard of review. 888 So.2d at 476. Brent argues that we should again review the trial court’s judgment de novo because, he alleges, that judgment was again based almost entirely on the written depositions of Olon’s physicians. See Rogers Found. Repair, Inc. v. Powell, 748 So.2d 869, 871 (Ala.1999) (“When a trial judge’s ruling is not based substantially on testimony presented live to the trial judge, review of factual issues is de novo.”). The petitioning children, however, argue that although we may review the written testimony of the three physicians de novo, we should afford the trial court’s judgment the presumption of correctness it is entitled to under the ore tenus rule because the trial court also heard live testimony supporting its judgment. We agree.
Pursuant to this Court’s instructions in Ex parte Queen, the trial court ruled on the issue of Olon’s competency at *1028 the time he signed the planning documents based on the evidence in the record at the conclusion of the December 17, 2001, evidentiary hearing. At that hearing, the petitioning children presented ore tenus testimony regarding Olon’s. competency, and they also submitted deposition testimony from three physicians who had treated Olon during the period in question. Brent did not testify at that hearing; rather, he submitted affidavits from various acquaintances of Olon’s. In Queen, we stated that we would review de novo the trial court’s original order finding that Olon was competent when he signed the planning documents because, “although the trial judge heard testimony from Olon’s children, his ruling is based almost entirely on the written depositions of Olon’s physicians and the affidavits submitted by Brent, not on oral testimony.” 888 So.2d at 476. However, it was ultimately unnecessary for us to consider either the weight or sufficiency of the evidence supporting the trial court’s judgment regarding Olon’s competency because of our holding that the trial court had committed errors of law by admitting the hearsay affidavits and by applying the wrong legal standard. De novo review was therefore appropriate because “[questions of law are reviewed de novo.” Pritchett v. ICN Med. Alliance, Inc., 938 So.2d 933, 935 (Ala.2006) (citing Alabama Republican Party v. McGinley, 893 So.2d 337, 342 (Ala.2004)).
In this appeal, we must finally review the merits of the trial court’s holding regarding Olon’s competency to sign the planning documents. That holding was based on the same evidence considered by the trial court in Queen, with the exception of the hearsay affidavits that were ordered stricken by this Court. That evidence included ore tenus testimony from the petitioning children that generally supports the trial court’s finding that Olon was incompetent, and we have no basis upon which to conclude, as we did in Queen, that the trial court failed to rely on that testimony or that it relied exclusively on the written evidence.[2] For that reason, the ore tenus rule applies and we must presume that the trial court’s judgment is correct “‘unless it is clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence.’ ” Pollard v. Unus Props., LLC, 902 So.2d 18, 23 (Ala.2004) (quoting American Petroleum Equip. & Constr., Inc. v. Fancher, 708 So.2d 129, 132 (Ala.1997)).
III.
Brent argues, first, that the judgment of the trial court should be reversed because, he argues, the petitioning children failed to meet their burden of establishing that Olon was incompetent when he executed the planning documents. Brent correctly notes that the petitioning children bore a heavy burden in this regard because “the right to control one’s property is a sacred right which should not be taken away without urgent reason.” Smith v. Smith, 254 Ala. 404, 409, 48 So.2d 546, 549 (1950) (citing In re Mills, 250 Wis. 401, 27 N.W.2d 375 (1947)). We explained the burden borne by the petitioning children as follows in Queen:
“The correct standard is whether Olon ‘was unable to understand and comprehend what he was doing’ at the time he signed the power of attorney and the partnership and trust agreements. *1029 Thomas [v. Neal], 600 So.2d [1000,] 1001 [ (Ala.1992) ]. The burden is initially on the petitioning children to show that Olon was not competent at the time he executed the documents; however, if they show that he was habitually or permanently incompetent before the transactions were attempted, the burden then shifts to Brent to show that the documents were made during a lucid interval. Abbott [v. Rogers], 680 So.2d [315,] 317 [ (Ala.Civ.App.1996) ].”
888 So.2d at 477. The petitioning children have not endeavored to establish Olon’s incompetency on the specific dates on which he executed each of the planning documents; rather, they argue that Olon was habitually or permanently incompetent before the execution of the first of those documents in December 1995, which incompetence continued until the execution of the last of those documents in 1998. Brent has consistently argued that Olon was not habitually or permanently incompetent during the period in question; he has therefore made no attempt to argue that Olon signed the planning documents during lucid intervals. Accordingly, the only inquiry we must make is whether the petitioning children adduced sufficient evidence from which the trial court could conclude that, by December 1995, Olon’s mental state had permanently deteriorated to such an extent that he was incapable of understanding and comprehending what he was doing when he executed legal documents.
The most specific evidence cited by the petitioning children on this point is the deposition testimony of Dr. William A. Hill, Jr., a cardiologist who began treating Olon in January 1994. Dr. Hill testified that Olon suffered from Alzheimer’s disease and expressed his opinion that Olon had been unable to manage his financial affairs from at least the first time he treated him. Moreover, when questioned by Brent’s attorney, Dr. Hill specifically testified that he believed Olon was incapable of understanding and signing legal documents:
“Q: Okay, in Mr. [Olon] Belcher’s case, based on your analysis of his having Alzheimer’s, what would be the components or factors in his situation that concludes you to think that he had Alzheimer’s?
“A: I think that he certainly had impaired memory as far as recent facts.
“Q: Was that short- or long-term-memory loss?
“A: It would be short-term-memory loss, some short — some long-term-memory loss, though he was still able to remember many things in the distant past. His favorite story was talking about playing football for Coach [Bear] Bryant.... So he was — he could remember facts like this, but he would forget where he was in the waiting room. He could — he would wander around the waiting room sometimes if left unattended, and certainly, he had, I think, loss of his ability to do — for executive thinking and decisions and this sort of thing. I would not have dared, if I’d had to do any kind of procedure on him, I personally would have regarded him as being not capable of signing the—
“Q: The form for the consent?
“A: —form for the consent because I don’t think that he was — he would have been capable to have understood that. For example, if I had wanted to do a heart catheterization on him or something like that, I would have wanted to talk to the family and would hope to get consent from them. I don’t think he had the ability to function and reason to this degree.
*1030 “Q: So besides the short-term-memory loss, what other component did you find?
“A: I think with his ability to, I would say, to make executive decisions, I refer to his executive decisions perhaps regarding his own health, his ability to understand and grasp situations.
[[Image here]]
“Q (while handing Dr. Hill Exhibit 7): Could you identify that, please?
“A: It’s a letter that I wrote ‘to whom it may concern.’ It says, ‘Dear Sir or Madam, I have been following Mr. [Olon] Belcher for his cardiac arrhythmia and overall cardiac health. Unfortunately, he has also been diagnosed with Alzheimer’s disease. It is my opinion that Mr. Belcher no longer has the capacity to handle his financial affairs.’
“Q: Do you recall writing this letter?
“A: I don’t recall the exact circumstances, no.
“Q: Well, do you recall generally the circumstances?
“A: I think that I had some discussion, I believe with one of the patient’s daughters regarding this, that she had asked my opinion on his ability to make financial decisions, and I felt that clearly, he was not able to make any kind of financial decisions.
“Q: You state in the letter that he’d been diagnosed with Alzheimer’s disease. What specifically do you mean by that statement in terms of what stage of Alzheimer’s were you referring to?
“A: Well, I would be — I would refer to it as a stage in which he is not able to give legal consent, he’s not able to ■ reason or grasp situations. You know, from my nonlegal, just general overall medical opinion, you know, I would think that he would not be capable of signing legal documents, certainly not being able to give informed medical consent to any kind of procedure.”
The petitioning children have also cited the deposition testimony of Dr. J. Brian Wilhite, who specializes in internal medicine and who examined Olon nine times between July 1995 and April 2000, and the deposition testimony of Dr. Britt Anderson, a neurologist who examined Olon four times in late 1993 and early 1994 and then again in June 2000. Like Dr. Hill, Dr. Wilhite also concluded that Olon suffered from dementia, although he was less sure that the dementia was specifically caused by Alzheimer’s disease. However, Dr. Wilhite nevertheless agreed that Olon’s dementia rendered him incapable of effectively managing his property and affairs at any time during the time Dr. Wil-hite treated him between 1995 and 2000. Dr. Anderson also diagnosed Olon with mild to moderate dementia, which he initially attributed to Alzheimer’s; however, after examining Olon in 2000, he subsequently expressed doubt about a diagnosis of Alzheimer’s based on the slow progression of Olon’s dementia. When asked about Olon’s capacity to manage his property and business affairs, Dr. Anderson expressed concern about Olon’s capacity to do so, but he was more optimistic than Olon’s other physicians about his capacity to do so, stating:
“Based on Mr. [Olon] Belcher’s dementia at these early visits, I would have concern about his ability to have correctly managed the specifics of business affairs related, for example, to balancing a checkbook or determining a budget. That would be an inference. They were not specifically tested.
*1031 “However, in terms of setting more general priorities for the distribution of assets or general directions of business activities, it is possible that Mr. Belcher may have been able to make those sorts of general statements competently at that time.
“I was not making a specific assessment for the purposes of competency at that time, but was making a medical evaluation, so I can’t be more precise to the capacity for the more global declarations.
“But I do believe based on his level of dementia he would be impaired for the basic day-to-day items related to running a business and financial matters.”
Finally, the petitioning children cite the testimony they gave at the evidentiary hearing regarding Olon’s mental state. Otha testified that, in July 1992, Olon executed a deed conveying 69 acres in Centre-ville to Otha; however, Otha subsequently learned that Olon had already conveyed that same property to Brent two months earlier in May 1992. Otha testified that Olon later could not remember conveying the property to either of them. Otha stated that this incident, along with Olon’s other memory-related problems, was the impetus for taking Olon to be examined by Dr. Anderson in 1993.
Queen testified that in late 1992 and early 1993 Olon uncharacteristically began getting lost when he traveled to places he had formerly been quite familiar with, such as a lake house owned by Brent and a cemetery in Birmingham next to the hospital where all five of his children were born. Finally, when Scroggins was asked by her attorney when Olon’s problems began, she testified as follows:
“Q: Do you have in your mind a point in time at which you believe your father had problems with his capacity to keep up with what he was doing, keep up with his' affairs?
“A: Well, I would say you know, before '93 — I mean he was obvious — I have not kept up with years or dates. But it’s been obvious for a long time that he was not, he was lacking in his judgment and his ability to remember.” '
The petitioning children argue that this evidence is sufficient under the ore tenus standard to support the trial court’s judgment holding that Olon lacked capacity to execute the planning documents; however, Brent argues that it is lacking for multiple reasons. First, Brent argues that the petitioning children have at most demonstrated only that Olon suffers from short-term-memory loss — which might be relevant to whether he is able to oversee and manage his business and financial affairs but has little bearing on whether he can understand and comprehend a specific legal document. As Brent succinctly argues in his brief to this Court, “one might properly have a conservator appointed based on a short-term memory difficulty but still be perfectly able to understand a legal document setting forth the management of certain assets or appointing one’s son as an attorney-in-fact.” (Brent and Olon Bel-cher Properties’ brief, p. 35.) In support of his argument, Brent quotes Ex parte Chris Langley Timber & Management, Inc., 923 So.2d 1100, 1107 (Ala.2005), in which this Court reversed a summary judgment entered by the trial court holding that an adult, Clayton Reynolds, was incapable of understanding the nature of legal deeds he had signed conveying certain timber land to Chris Langley Timber & Management, stating:
“It is not clear how severe short-term memory loss, which is all that Dr. Jackson’s testimony appears to establish Reynolds suffered from, demonstrates *1032 that Reynolds was unable to ‘understand in a reasonable manner the nature and effect of executing the timber deeds. See Wilson [v. Wehunt], 631 So.2d [991,] 996 [ (Ala.1994) ]. We recognize that the ultimate conclusion of Dr. Jackson’s July 2001 evaluation appears to be that Reynolds was ‘no longer competent to manage his financial affairs.’ However, given the questionable basis for Dr. Jackson’s conclusions (Reynolds’s deficient short-term memory), the evidence with which Langley Timber responded to the estate’s summary-judgment motion is substantial; it is of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer from it that Reynolds was able to understand in a reasonable manner the nature and effect of his signing the timber deeds.”
(Footnote omitted.) However, the evidence in the record in this case differs from the evidence that was apparently available in Ex parte Chris Langley Timber & Management. First, we note that Dr. Hill not only testified generally that Olon was incapable of handling his financial affairs but specifically that “he would not be capable of signing legal documents.” Moreover, although the three physicians who were deposed in this case all agreed that Olon suffered from short-term-memory problems, unlike Dr. Jackson’s testimony regarding Reynolds in Ex parte Chris Langley Timber & Management, their testimony established that Olon’s dementia encompassed more than just short-term-memory loss. For example, when Dr. Anderson was questioned by the petitioning children’s attorney about the characteristics of Olon’s dementia, he testified as follows:
“Q: All right, sir. With reference to your diagnosis of mild dementia, let me show you, if I could, the definition of the word ‘dementia’ in the 28th edition of Dorland’s Illustrated Medical Dictionary. You recognize Dorland’s, do you, sir?
“A: Yes. I recognize it as a dictionary. I wouldn’t recognize it as a final authority for defining medical terminology.
“Q: Let’s see what we can do with it. Look at the word. Actually, I’ve highlighted the word ‘dementia.’ And if you would, read the first sentence.
“A: ‘Dementia, DSM-3-R, an organic mental syndrome characterized by a general loss of intellectual abilities involving impairment to the memory, judgment, and abstract thinking as well as changes in personality.’
“Q: Is it your opinion, Doctor, that that definition applies to the type of dementia that you diagnosed in Mr. Olon Belcher in December and in January and later in June of 1993 and 1994?
“A: This sentence in isolation seems to my reading to imply that someone must have all of these domains simultaneously involved. And I would disagree with that inasmuch as I think they must have multiple of these domains involved, but not necessarily all of the domains involved. And with that stipulation, I would say that the definition applies to Mr. Belcher.
“Q: Does it apply, the list of impairments in memory, judgment, and what was the third one?
“A: Abstract thinking and changes in personality.
“Q: Would all three of those descriptions apply to Mr. Belcher in 1993 and 1994 in your judgment?
*1033 “A: I have direct evidence from my physical assessment of changes in memory and abstract thinking. Changes in judgment or personality were inferred from the history provided to me. And in that regard, I would think that there was also some impairment in judgment as evidenced by driving, but I didn’t have any specific evidence or inferences regarding a change in personality.”
And, when Dr. Wilhite was specifically asked if Olon’s memory loss was the basis of his conclusion that Olon was not capable of handling his business affairs, he replied “[a]nd the fact that he had dementia,” thus implying that Olon’s dementia was characterized by more than mere short-term-memory loss. Queen also testified that beginning in late 1992 Olon began getting lost while traveling to places he had regularly visited and that he should have been familiar with. Accordingly, the facts in this case are distinguishable from the facts in Ex parte Chris Langley Timber & Management because here there is ample evidence indicating that Olon’s dementia went beyond mere short-term-memory loss. The evidence submitted by the petitioning children also supports a finding not only that Olon was incapable of managing his financial affairs, but also that he was specifically unable to understand and comprehend legal documents.
Brent next argues that even if the petitioning children have established that Olon suffered from dementia, they have not established that that dementia permanently deprived him of the ability to understand legal documents so as to excuse the petitioning children from establishing that Olon was incapable of understanding the planning documents on the specific dates he executed them. See Ex parte Chris Langley Timber & Mgmt., 923 So.2d at 1105 n. 6 (“ ‘[Pjroof of insanity at intervals or of a temporary character would create no presumption that it continued up to the execution of the instrument, and the burden would be upon the attacking party to show insanity at the very time of the transaction.’ ” (quoting Pritchard v. Fowler, 171 Ala. 662, 672, 55 So. 147, 149 (1911))). In support of his argument that Olon’s dementia was not a permanent condition, Brent cites an exchange during Dr. Hill’s deposition between Brent’s attorney and Dr. Hill, in which Dr. Hill was questioned about a note in his records, made after a December 19, 1996, examination of Olon, stating that “[t]he family actually thinks his memory is improving some”:
“Q: Would that comment be consistent with your early analysis about him having Alzheimer’s?
“A: Yes, I think so.
“Q: How so?
“A: I think people with Alzheimer’s can wax and wane. They can— their memory can come and go. They can have good days or bad days, good periods, bad periods. I’m not sure what — whether he was still on medication at that time or not or whether he was stili seeing a neurologist, but, you know, they do have medicines which, in some people, can help improve their thinking, perhaps, or their diet, and that sort of thing. But their memory can improve some. Certainly, I did not mean to [imply] by that note that he was mentally normal.
“Q: Is Alzheimer’s a progressive ■ disease?
“A: It can be slowly progressive, it can be very rapidly progressive. I think that it can be one in which the decline tends to come and go in intervals and this sort of thing.
*1034 “Q: And—
“A: In other words, sort of like the stock market. Nothing goes straight up, and nothing goes straight down, generally.
“Q: So it would be your opinion that it’s possible that someone with Alzheimer’s may have regression or improvement in their mental condition over some period of time?
“A: Well, let me put — I think that their clinical appearance may improve so that they’re able to perhaps function better in society.
[[Image here]]
“Q: Is it your testimony that Mr. [Olon] Belcher’s Alzheimer’s has been cyclical, or up and down, as you called it, like the stock market? Is that—
“A: I think to a certain degree, it has. I think he has continued to sort of slowly progress, but certainly, he’s had good periods and bad periods.
“Q: Would his condition be like a— well, you say it’s up and down as opposed to being—
“A: To a certain degree. I think the general trend is certainly down, although he’s continued to function at home.
“Q: When you say ‘down,’ what do you mean? You mean regressive or improvement?
“A: Deteriorating.
“Q: Deteriorating?
“A: Slowly deteriorating.”
However, although this testimony does indicate that Olon may have had some periods of relative lucidity, when Dr. Hill was asked by the petitioning children’s attorney to elaborate on his comments, Dr. Hill opined that, even during the best of those periods, Olon lacked legal capacity:
“Q: And even at the best period, Doctor, that you have seen in Mr. [Olon] Belcher, even at the best of the ups that you have experienced in your contact with Mr. Belcher since you first saw him in 1994, would it be your opinion even at the best of his times that he would or would not be mentally competent to handle those kinds of affairs that you’ve talked about in this deposition, that is, to give informed consent, to handle his financial affairs, to manage his property and business?
“A: I think from the time I’ve seen him in 1994, he really has not been able to give informed consent or to fully handle his financial affairs.
“Q: Or to manage his property effectively?
“A: Or manage effectively, yes.”
Of course, as noted supra, Brent could have attempted to rebut Dr. Hill’s testimony by submitting evidence indicating that Olon had executed the planning documents during a lucid interval; however, he has not done so. In light of the evidence that is in the record, we cannot say that the trial court clearly erred in concluding that Olon was permanently incapacitated at the time he executed the first of the planning documents and that that incapacity continued until he executed the last of the planning documents.
Finally, Brent argues that the petitioning children should be estopped from challenging Olon’s competency because they continued to accept financial gifts and economic benefits from Olon even after the time they allege he lost the capacity to contract. We disagree. The issue in this case is Olon’s competency. The petitioning children have acknowledged that the transactions they had with Olon should be reviewed by his conservator and that those *1035 transactions may be challenged if they are found to be contrary to Olon’s interests. Allowing any child to profit at their incompetent parent’s expense based on inappropriate transactions made after that parent became incompetent simply because other siblings might have done likewise would be bad policy indeed, and we cannot say that the trial court exceeded its discretion by rejecting Brent’s estoppel argument in that regard.
IV.
Brent next argues that, even if this Court determines that there is sufficient evidence to support the trial court’s holding that Olon was legally incompetent at the time he executed the planning documents, the trial court nevertheless erred by declaring void the December 1995 partnership agreement that created Olon Bel-cher Properties, Ltd. Brent argues that the December 1995 partnership agreement was not simply an agreement between him and Olon, but between him, Olon, and Hazel Belcher — Olon’s wife and Brent’s mother. Brent argues that Hazel’s competency to enter into the partnership agreement has never been challenged and that, even “[i]f [Olon’s] conservator desires and could equitably withdraw [Olon’s] interest from the partnership, he can do so in accordance with the [partnership] agreement, and the partnership can go on at the direction of Brent and Mrs. Belcher’s estate.” [3] (Brent and Olon Belcher Properties’ brief, p. 49.)
Brent further argues that there is nothing in Alabama caselaw or in the Alabama Limited Partnership Act, § 10-9B-101 et seq., Ala.Code 1975, that provides that a finding made over 10 years after the fact that one partner was incompetent at the time the partnership agreement was executed and the partnership was formed renders the entire partnership void — no matter whether there are 2, 10, or 100 other, presumably competent, partners. To the contrary, Brent cites a treatise on partnership law for the proposition that a partnership agreement is not void merely because a partner was incompetent at the time the partnership agreement was signed:
“From the standpoint of partnership law, it is clear that an incompetent is a ‘person’ who may be a partner pursuant to [partnership statutes].... Thus, the partnership is not void but is fully existing until steps are taken to dissolve it. This would be equally true if the partner was insane before formation of the partnership.”
1 Alan Bromberg & Larry Ribstein, Bromberg & Ribstein on Partnership § 2.04(f), at 2:30-40 (2007).
The petitioning children nevertheless argue that the trial court’s decision voiding the December 1995 partnership agreement was correct under basic principles of contract law, which provide that incompetent minds cannot provide the assent necessary to form a contract. See, e.g., § 8-1-170, Ala.Code 1975 (“[A]ll contracts of an insane person are void.”), and Cunningham v. Staples, 216 Ala. 531, 533, 113 So. 590, 591 (1927) (“ ‘Neither writing, nor any other particular form need be observed in the formation of a trading or laboring partnership. Mutual consent of two or more competent minds can make this, as it can make other contracts.’ ” (quoting Nelms v. McGraw, 93 Ala. 245, 247, 9 So. 719, 720 (1891))). Thus, they argue, Olon could not have properly agreed to the partnership or conveyed assets to the partnership, and the trial court’s judgment voiding the partnership agreement should be upheld.
*1036 We agree with Brent that Olon’s incompetency does not require the voiding of the entire December 1995 partnership agreement. There were other partners who were parties to that agreement, and, should they desire to do so, those partners may continue the partnership insofar as they are concerned. However, the petitioning children are also correct that Olon’s incompetency prohibited him from validly conveying any assets into that partnership. His conservator is therefore tasked with the job of reviewing Olon’s transactions with and contributions to the limited partnership and determining whether Olon received fair value for those contributions. Going forward, the conservator should continue to manage Olon’s assets so as to maximize their value, and, as part of that management, he may elect to continue in the partnership, thus, in a sense ratifying the partnership agreement signed by the incompetent Olon, or he may elect to withdraw Olon’s assets and end Olon’s participation in Olon Belcher Properties.
V.
Olon Belcher Properties next argues that the trial court erred by denying its motion to intervene after the trial court entered its judgment declaring the planning documents to be void. In City of Dora v. Beavers, 692 So.2d 808, 810 (Ala.1997), we stated:
“The decision to grant or to deny a motion to intervene is within the sound discretion of the trial court, and this Court will not disturb that ruling absent an abuse of discretion. Valley Forge Ins. Co. v. Alexander, 640 So.2d 925, 927 (Ala.1994). In its exercise of discretion, the trial court must determine whether the potential intervenor has demonstrated: (1) that its motion is timely; (2) that it has a sufficient interest relating to the property or transaction; (3) that its ability to protect its interest may, as a practical matter, be impaired or impeded; and (4) that its interest is not adequately represented. Rule 24(a)(2), Ala. R. Civ. P.”
Olon Belcher Properties argues that the trial court exceeded its discretion because, it says, the motion to intervene, filed within 30 days of the trial court’s order, was timely; that it has an obvious interest in the proceedings, which concern the very existence of the partnership; that its ability to protect that interest would be impaired if it is excluded from the proceedings; and that its interest is not adequately represented by Brent because it has unique arguments to present. The petitioning children counter that the trial court acted within its discretion in denying Olon Belcher Properties’ motion to intervene both, they say, because the motion to intervene was untimely and because Brent has consistently defended the partnership’s interest. We agree.
In their brief to this Court, Brent and Olon Belcher Properties argue that the motion to intervene was timely because it was made within 30 days of the trial court’s order entering the judgment and because the validity of neither the partnership agreement nor the partnership itself was an issue until that point:
“The partnership’s motion was timely because it was filed immediately after the circuit court ruled, in a somewhat surprising fashion, that Mr. Belcher was incompetent when he signed the partnership [agreement], and, because of that, the partnership agreement and the partnership itself was ‘void.’ This issue had not been briefed (indeed, it was not truly an ‘issue’ at that point), and unlike the 1995 power of attorney and the 1998 revocable trust, the partnership had not been challenged earlier. In fact, counsel *1037 for the [petitioning children] had stated at an earlier hearing [that] validity of the partnership agreement was not at issue. Given the surprising ruling, and the fact that the partnership filed its motion to intervene so soon after the August 8, 2007, ruling (within 30 days), the motion was not untimely.”
(Brent and Olon Belcher Properties’ brief, pp. 54-55 (emphasis original; citations- to clerk’s record and footnote omitted).) However, the record belies the contention of Brent and Olon Belcher Properties that the validity of the partnership agreement was not at issue until the trial court entered its ruling on August 8, 2007. In a motion filed in the trial court on January 16, 2002, Brent — the managing general partner of Olon Belcher Properties— evinced his understanding that the validity of the partnership agreement was under review, as well as an understanding of the potential consequences if the partnership agreement was voided when he stated:
“Assuming for purposes of this discussion that a particular transaction such as the organization and funding of the Olon Belcher Properties, Ltd., partnership by Mr. and Mrs. Olon Belcher and Brent Belcher in 1995 is now determined by the conservator to not be in Mr. Bel-cher’s best interest, then the unwinding or setting aside of that transaction would create tremendous business and tax burdens and problems on all persons participating in the partnership, including, Mr. and Mrs. Olon Belcher, Brent Belcher, Mr. and Mrs. William [and Beverly Jean] Scroggins, financial lenders to the partnership, tenants who have leased building space from the partnership, prospective new building tenants and other third parties dealing with the partnership. If this transaction were to be unwound, as not in Mr. Belcher’s best interest, this would also require the return of the partnership interest gifted to Mr. and Mrs. Scroggins by Mr. and Mrs. Olon Belcher over the years with very untimely and unfortunate tax and business results, the return of funds paid to various family members and the recon-veyance of real property deeded to Otha Belcher, the partnership and others.”
The final sentence of this Court’s opinion in Queen — released on October 10, 2003, almost four years before the motion to intervene was filed on September 7, 2007 — also explicitly states: “We reverse the order of the trial court and remand this case for reconsideration consistent with this opinion to determine whether Olon Belcher was competent to execute the power of attorney and to enter-into the partnership agreement and the trust agreement.” 888 So.2d at 478 (emphasis added). Based on this record, Brent and Olon Belcher Properties cannot maintain that they learned of the partnership’s interest in this litigation only when the trial court announced its ruling on August 8, 2007.[4] They were aware of that interest at least four years earlier, yet the partnership failed to take any steps to intervene during that period. In light of that delay and of the fact that Brent has been an active participant in this litigation and has consistently sought to preserve and defend the partnership’s interests, we are not inclined to hold that the trial court exceeded its discretion in denying Olon Belcher *1038 Properties’ motion to intervene. See QBE Ins. Corp. v. Austin Co., 23 So.3d 1127, 1132 (Ala.2009) (listing factors relevant to determining timeliness of a motion to intervene).
VI.
Finally, Brent argues that this Court erred in Queen when it held that the trial court erred by originally applying the standard for testamentary capacity to determine the validity of the March 1998 document executed by Olon creating a revocable trust. Brent argues that a revocable trust is merely a will substitute and that the standard applicable to wills should have therefore been applied. In support of his argument, Brent quotes Restatement (Third) of Trusts § 25, cmt. a (2003), which states that “the revocable trust is widely used as a legally accepted substitute for the will as the central document of an estate plan....” In Queen, we discussed the level of competency a party must have to execute a trust agreement and concluded:
“In Abbott v. Rogers, 680 So.2d 315, 317 (Ala.Civ.App.1996), the Court of Civil Appeals held that a person challenging a conveyance on the ground of mental incapacity need show only ‘that the grantor was unable to understand and comprehend what he or she was doing’ (citing Thomas v. Neal, 600 So.2d 1000 (Ala.1992)). A trust agreement is an inter vivos conveyance of property, and is, therefore, subject to the standard governing conveyances. See I A.W. Scott & W.F. Fratcher, Scott on Trusts §§ 18 & 19, at 243-4 (4th ed.1987) (stating that an owner of property is capable of placing that property in trust if he is otherwise capable of conveying it, but if his conveyance would be voidable because of insanity or the like, his declaration of trust would likewise be voidable).”
888 So.2d at 477. Having already considered this issue once, we are disinclined to reopen it now. As evidenced by the citation to Scott on Trusts (4th ed.1987) in Queen, there is authority supporting the decision already made by this Court. The law-of-the-case doctrine provides that when a court decides upon a rule of law, that rule should continue to govern the same issues in subsequent stages in the same case, thereby hastening an end to litigation by foreclosing the possibility of repeatedly litigating an issue already decided. Ex parte Discount Foods, Inc., 789 So.2d 842, 846 n. 4 (Ala.2001). The law-of-the-case doctrine may be disregarded if the court is convinced its prior decision was clearly erroneous or there has been an intervening change in the law; however, we are not convinced that that is the case here. Accordingly, we reiterate the statement made by this Court in Queen that “[a] trust agreement is an inter vivos conveyance of property, and is, therefore, subject to the [competency] standard governing conveyances.” 888 So.2d at 477.
VII.
On August 8, 2007, the trial court held that Olon was incompetent when he executed each of the planning documents and that each of those documents was accordingly void. We now affirm the holding that Olon was incompetent and the judgment holding the December 1995 durable power of attorney and the March 1998 document creating a revocable trust to be void. However, because the December 1995 partnership agreement was an agreement executed by multiple other parties besides Olon, we reverse the trial court’s judgment holding that document to be void. On remand, the court-appointed conservator should examine Olon’s transactions with the partnership to determine whether they have been in his best inter *1039 ests and whether it is appropriate for Olon to continue to participate in the partnership or to withdraw his interests.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
COBB, C.J., and LYONS and BOLIN, JJ., concur.
MURDOCK, J., concurs in the rationale in part and concurs in the result.

. A fifth sibling, Olon P. Belcher, Jr., is not a party to this litigation.

. The fact that, after the hearsay affidavits were excluded, the trial court came to the opposite conclusion — that Olon was not competent when he signed the planning documents — supports our statement.in Queen that the trial court’s original finding that Olon was competent was based on the written evidence, notably the affidavits. 888 So.2d at 476.

. Hazel died in October 1999.

. Brent and Olon Belcher Properties have also represented that counsel for the petitioning children conceded at a hearing that the validity of the partnership agreement was not an issue. However, the transcript of that hearing indicates that counsel actually stated only that the intent — not the validity — of the partnership agreement was an issue for a later time: "Without going into what was intended by the [partnership agreement] because that’s another issue at a later time....”