THOMPSON, Presiding Judge.
Howard Wells (“Howard”) appeals from the judgment of the Etowah Circuit Court in favor of his brother, Roger Wells (“Roger”), the administrator of the estate of Sarah Frances Wells; Sarah Frances Wells (“the mother”) was the parties’ mother. For the reasons set forth herein, we reverse the judgment.
The mother had lived in Gadsden in a house that she owned. The mother had five sons. Before the time pertinent to the present case, two of her sons had died. In 2007, the mother began living in an assisted-living facility. In the summer of 2007, she was admitted to the hospital where she remained until her death. In August 2007, the mother executed a deed conveying her house to Howard but reserving a life estate in the house for herself (“the August 2007 deed”). Because Howard feared that the August 2007 deed, even though it was recorded, was insufficient because it was witnessed by only one person, he had a second deed prepared for the mother, which she executed in September 2007 (“the September 2007 deed”).
The mother died on October 6, 2007, and Roger was appointed the administrator of her estate. On December 4, 2007, Roger, as the administrator of the mother’s estate, filed an action against Howard in which he sought a judgment voiding the August 2007 deed on the basis that the mother had not been mentally competent to execute that deed.
The trial court held a bench trial on May 13, 2009. The focus of the trial appears to have concerned the validity of the September 2007 deed rather than the August 2007 deed. At the trial, Sherry Wells (“Sherry”), Roger’s wife, testified that she and Roger had spent a substantial amount of time with the mother, despite the fact that they resided in Birmingham. Sherry testified that the mother had had problems with her memory. In particular, she stated, the mother often had asked the same question multiple times, forgetting the answer that had just been given her. Sherry testified that she and Roger had paid, the mother’s bills for her, had purchased groceries for her, and had prepared food for her so that the mother would not have to cook. Sherry testified that the mother would not have known what she was signing when she executed the deed conveying her house to Howard. Sherry testified that, in her opinion, the mother had not been competent to make business decisions and to handle her business affairs.
Roger testified that the mother had often repeated herself and had asked the same questions multiple times. He stated that she had not been capable of handling her business affairs, that he had had to handle her business affairs for her, and that he had paid her bills for her because she did not remember to do so. Roger testified that the mother had been admitted to the hospital in the summer of 2007 and that, at that time, she had been confused and had not known where she was. He stated that he did not believe that, in signing the deeds conveying her house to Howard, she had known what she was doing. He testified that, during the period *218 when she signed the deeds, she would have signed anything that was placed in front of her.
Opal Hathcock, a former neighbor of the mother’s, testified that she had been a close friend of the mother’s for more than 40 years. Hathcock testified that the mother had told her on numerous occasions that it was the mother’s intent to give her house to Howard because Howard was handicapped[1] and, unlike his brothers, was unable to obtain employment. On cross-examination by Roger, Hathcock testified that she had not talked to the mother after the mother was hospitalized in the summer of 2007.
Vivian Rogers, another former neighbor of the mother’s, testified that she had known the mother for 50 years and that the mother had told her on numerous occasions that it was her intent to leave her house to Howard. However, like Hath-cock, she had not spoken to the mother after the mother was hospitalized in the summer of 2007.
Bill Rogers, another former neighbor of the mother’s, testified that he had known the mother for 80 years and that she had told him that she wanted Howard to have her house. He stated, however, that he had not spoken with the mother after she became sick.
Gary Burns, the attorney who had drafted the deeds at issue in the case, testified that Howard had come to his office and had asked him to prepare a deed conveying the mother’s house to him. He stated that he had done so and that he had given the deed to Howard to take to the mother. After the mother signed the deed on August 8, 2007, Burns told Howard to have it recorded. When Howard attempted to do so, Howard was told by someone in the probate office that the deed could not be recorded because it contained the signature of only one witness. Howard had it recorded anyway. Burns testified that Howard later returned to him and requested that he prepare another deed because Howard feared that the first deed, containing the signature of only one witness, was not effective. Burns testified that, at that point, he called the mother and she told him that she wanted Howard to have her house because her other sons had houses but Howard did not. Burns testified that, during that conversation, the mother seemed competent. Although he had included a life estate for her in the first deed. Burns testified that the mother told him that, in preparing the second deed, there would be no need for him to include a life estate for her. After he prepared the deed, he sent his secretary, Linda Gat-tis, to the hospital with the deed for the mother to sign it and for Gattis to notarize it. He testified that, after Gattis returned with the deed, he asked her if the mother appeared competent, to which Gattis responded affirmatively.
Gattis testified at the trial. About her meeting with the mother when the mother signed the September 2007 deed, Gattis testified as follows:
“Q. So, you went to her hospital room to see her?
“A. Yes, I did.
“Q. And at the time that you went to have her sign this, did you go over the form with her and explain it to her?
“A. Yes, I did.
“Q. Did she seem like she was competent at the time that she signed it?
“A. Yes, she was.
“Q. Did she fully understand and agree that this is what she wanted to do?
*219 “A. Yes, she did.
“Q. And have you done this in the past in your position as a legal secretary?
“A. Yes, I have.
“Q. And when [the mother] signed this, did you feel fully confident that she knew what she was doing when she signed and you notarized because of that?
“A. Right. Yes.”
In further testimony, Gattis stated that she had asked the mother whether she wanted to sign the deed, and the mother had responded that she did.
In addition to the testimony of the foregoing witnesses, Roger introduced into evidence the deposition of Dr. Hemant Sinha. In his deposition, Dr. Sinha, who specialized in internal medicine, testified that he had seen the mother when she had been admitted to the hospital in November 2006. He testified that, at that time, she had numerous medical problems, including uncontrolled diabetes, uncontrolled blood pressure, and dizziness. He testified that he had seen her again when she was admitted to the hospital in the summer of 2007.
Dr. Sinha testified that the mother had been diagnosed with chronic dementia. He stated that a person with chronic dementia cannot remember recent events and experiences forgetfulness. He testified that it could be a problem for a person with chronic dementia to handle his or her everyday affairs, such as paying bills, because that person may not remember which bills he or she had paid. Specifically with regard to the mother, Dr. Sinha testified that he had seen the mother only for the acute medical problems she had experienced at the hospital, and he “did not go into any detail about investigating” her dementia.
With regard to the mother’s dementia, Dr. Sinha’s deposition contained the following exchange:
“Q. Okay. And you may or may not be able to answer this question. But what we are here about is that allegedly [the mother] signed a deed of her property, her home, over to one of her sons. Okay. I guess my question would be: During that time, would [the mother] have the capacity to make a decision to sign her property over to somebody else? Would she know what she was doing at the time?
“A. When was that? What time was this?
“Q. That was in August of '07.
“A. Well, I mean, like you said, I can’t say for sure whether she had the mental capacity to do or not. But by that time she already, you know, had the problems with the memory. And she was already on that medicine. You know, once again, we’ll have to go back on the exact detail dictation of Dr. Jamil, you know, because they do, you know, detailed checkup like MMST and stuff like that. You know, they do a full mental exam to tell us exactly what on that particular day her mental status was, you know. But we did have some concerns, like I said, you know, starting from the November 2006 and, of course, we are talking now August 2007. So that certainly she already had that diagnosis, you know, of ongoing dementia by then.
“Q. Okay. So are you saying that if nothing else it would be a concern?
“A. Yes.
“Q. Okay. Would she — would you recommend — would you have recommended at that time that she be able to make a decision like that or handle her business that way?
*220 “A. Well, you know, she was already on the medicine, you know. So the medicine sometimes helps. You know, if other factors that could cause dementia like a thyroid problem, B-12 — and I’m pretty sure we had already checked those things and Dr. Mu also had checked all those things. And I’m pretty sure they were okay. Dr. Mu is an expert on thyroid and the diabetes, you know. So he says that she had some, you know, peripheral neuropathy and the dementia. That is from his note of November of 2006. So that would be a concern, but I can’t say, you know, for sure whether she was yes or no able to do that, you know.”
When asked the difference between dementia and chronic dementia, Dr. Sinha testified that a person with chronic dementia has an “underlying baseline dementia which can go up and down based on different things.” When asked whether a person with chronic dementia should “be writing checks, paying their bills, [and] taking care of their daily affairs,” Dr. Sinha responded: ‘Well, they may make mistakes. I mean, it is their wish and will and right to do it, you know, if they want to do it. But now, of course, there are more chances of making mistakes.”
Roger also entered into evidence certain medical records of the mother. According to those records, the mother was admitted to the hospital in November 2006 complaining of dizziness, multiple recent falls, and uncontrolled diabetes. The record providing the history taken of the mother on admission stated: “Historical information is being provided by old records and by the [mother]’s daughter-in-law.... During the interview it is very evident that the [mother] is confused. She is unable to recall recent and long-term events.” Dr. Sinha, who examined the mother during her hospital admission, stated in his record of that examination that the mother was experiencing some confusion. He sought a consultation from another doctor regarding the mother’s confusion and possible dementia. In the mother’s discharge summary from her hospital stay, Dr. Sinha listed a diagnosis upon discharge of dementia with no behavioral disturbances. In that report, he wrote: “[The mother] was very confused on admission and Dr. Jamil was consulted to rule out dementia. After examination, he concluded that [the mother] was alert and oriented x 3 but had some cognitive deficits noted.” Dr. Sinha also noted that the mother “still has some confusion at times.... ” The medical records reflect that the mother was admitted to the hospital in June 2007 for surgery related to colon cancer. Records from that admission indicate that the mother had a continuing diagnosis of chronic dementia and had been prescribed medication for her dementia.
On May 18, 2009, the trial court entered a final judgment in Roger’s favor. In its judgment, the trial court wrote, in pertinent part:
“[The mother] had a diagnosed mental incapacity such that she would be unable to execute this deed.[2] See Ala.Code [1975,] § 35-4-1.
“Medical testimony and medical records introduced in this case confirm her dementia was chronic, meaning a long-term, underlying, baseline dementia. See [Roger’s] Exhibit One, Dr. Sinha’s Deposition.
“[Howard’s] attorney pointed out that patients with chronic dementia may have *221 better days and worse days, but since a baseline dementia is always present, such would seem to preclude any argument by [Howard] that the deed could have been executed during a ‘lucid interval.’
“Of course, a deed is not invalid for grantor’s want of mental capacity unless she did not have sufficient capacity to fairly understand the nature and consequences of her act. See Frederic v. Wilkins, 182 Ala. 348, 62 So. 518 (1913). However, Dr. Sinha’s testimony precludes the possibility that [the mother] retained sufficient residual functional capacity to handle even the most basic of everyday business affairs. See [Roger’s] Exhibit 1, at p. 14.
“Several witnesses that were long time neighbors and acquaintances of [the mother] testified that it had been her intent for several years to deed the land to [Howard], If that be the case, it is most unfortunate that the [mother] did not execute a deed before her Alzheimer’s dementia diagnosis (see [Roger’s] Exhibits 1 and 2) and while she retained sufficient legal capacity to execute this deed instrument.
“With the [mother] lacking same at the time she executed this deed, this subject deed is hereby declared void. It is therefore set aside, and held for naught. See Wilkinson v. Wilkinson, 129 Ala. 279, 30 So. 578 (1901).”
Howard filed a motion to alter, amend, or vacate the judgment or, in the alternative, for a new trial, which the trial court denied.
Howard filed a timely appeal to this court, which transferred the appeal to the supreme court for lack of appellate jurisdiction. The supreme court transferred the appeal back to this court pursuant to § 12-2-7(6), Ala.Code 1975.
The standard by which this court reviews a judgment entered following a bench trial is well settled:
“Because the trial court heard ore tenus evidence during the bench trial, the ore tenus standard of review applies. Our ore tenus standard of review is well settled. ‘ “When a judge in a nonjury case hears oral testimony, a judgment based on findings of fact based on that testimony will be presumed correct and will not be disturbed on appeal except for a plain and palpable error.” ’ Smith v. Muchia, 854 So.2d 85, 92 (Ala.2003) (quoting Allstate Ins. Co. v. Skelton, 675 So.2d 377, 379 (Ala.1996)).
“‘“The ore tenus rule is grounded upon the principle that when the trial court hears oral testimony it has an opportunity to evaluate the demeanor and credibility of witnesses.” Hall v. Mazzone, 486 So.2d 408, 410 (Ala.1986). The rule applies to “disputed issues of fact,” whether the dispute is based entirely upon oral testimony or upon a combination of oral testimony and documentary evidence. Born v. Clark, 662 So.2d 669, 672 (Ala.1995). The ore tenus standard of review, succinctly stated, is as follows:
“ ‘ “[W]here the evidence has been [presented] ore tenus, a presumption of correctness attends the trial court’s conclusion on issues of fact, and this Court will not disturb the trial court’s conclusion unless it is clearly erroneous and against the great weight of the evidence, but will affirm the judgment if, under any reasonable aspect, it is supported by credible evidence.” ’
“Reed v. Board of Trs. for Alabama State Univ., 778 So.2d 791, 795 (Ala.2000) (quoting Raidt v. Crane, 342 So.2d 358, 360 (Ala.1977)). However, ‘that presumption [of correctness] has no ap *222 plication when the trial court is shown to have improperly applied the law to the facts.’ Ex parte Board of Zoning Adjustment of Mobile, 636 So.2d 415, 417 (Ala.1994).”
Kennedy v. Boles Inv., Inc., [Ms. 1080607, March 12, 2010] — So.3d -, - (Ala.2010).
Like our standard of review, the law applicable to the resolution of questions related to the legal capacity to convey real property is well settled:
“The test for insanity as the ground for voiding a deed is whether the grant- or ““had sufficient capacity to understand in a reasonable manner the nature and effect of the act which he was doing.’ ” ’ Wilson v. Wehunt, 631 So.2d 991, 996 (Ala.1994) (quoting Hall v. Britton, 216 Ala. 265, 267, 113 So. 238, 239 (1927), quoting in turn 18 C.J. 218, § 131); see also McAlister v. Deatherage, 523 So.2d 387, 388 (Ala.1988), and Weaver v. Carothers, 228 Ala. 157, 153 So. 201 (1934). In order to render a deed void, the burden of proof is on the party attacking the conveyance to show the incapacity of the grantor at the time the conveyance is made. Abbott v. Rogers, 680 So.2d 315, 317 (Ala.Civ.App.1996). However, insanity existing before the time of the conveyance will raise a presumption of insanity at the time of the conveyance if it is shown that the insanity is permanent in its nature. Abbott, 680 So.2d at 317 (citing Wilson, 631 So.2d at 996); see also Pritchard v. Fowler, 171 Ala. 662, 672, 55 So. 147, 149 (1911). If the party challenging the conveyance establishes that the grantor suffers from a permanent type of insanity, then the burden shifts to the party defending the conveyance to show that the transaction occurred during a lucid interval. Wilson, 631 So.2d at 996.”
Ex parte Chris Langley Timber & Mgmt., Inc., 923 So.2d 1100, 1105 (Ala.2005).
Howard contends that the evidence at trial did not support the trial court’s conclusion that the mother lacked testamentary capacity at the time she executed the September 2007 deed. He argues that he presented substantial testimony demonstrating that the mother had, for years, intended to convey her house to him, and, quoting McKinney v. Weatherford, 242 Ala. 493, 496, 7 So.2d 259, 262 (1942), he points out that “a deed or will being made in conformity to a fixed determination, freely entertained and expressed for years, is the strongest proof of capacity to make such a deed or will.” He argues that Roger presented no evidence regarding the mother’s intentions, physical demean- or, or capacity at the time she signed the September 2007 deed. He contends that the medical records and the deposition of Dr. Sinha indicating that the mother had dementia did not sufficiently satisfy Roger’s burden of demonstrating that the mother was incompetent to execute the September 2007 deed.
As previously stated, a party seeking to have a deed set aside as void based on the grantor’s incompetence can satisfy its burden of proof by submitting evidence indicating that the person executing the deed was suffering from an incompetence that was permanent in nature. In the present case, the medical records indicate that the mother was diagnosed with dementia almost a year before she signed the September 2007 deed and that, at the time she was diagnosed with that disease, she was very confused and unable to give an appropriate history to the nurse who was examining her. The medical records indicate that she was thereafter diagnosed with chronic dementia, which Dr. Sinha testified constituted constant, as opposed to intermittent, dementia. Roger and his *223 wife, who cared for the mother during the last year of her life, testified that the mother often had repeated questions that they had already answered and that the mother had been unable to take care of her financial business. They also testified, without objection, that they did not believe that the mother would have understood what she was signing when presented with the deeds, and Roger testified that the mother would have signed any document placed in front of her.
Having reviewed all the evidence of record, we conclude that the trial court’s finding that the mother experienced a permanent incompetence was supported by substantial evidence. Thus, Howard’s contention is without merit. We recognize, of course, that Howard submitted evidence, through the testimony of the mother’s neighbors, as well as through the testimony of the attorney and the secretary involved in the transaction, indicating that, at the time of the transaction, the mother did not suffer from a lack of capacity to convey her house to Howard. However, it is not within the purview of this court to weigh the conflicting evidence submitted at trial; that was the function of the trial judge. Kennedy, — So.3d at -. As stated, the trial court had before it sufficient evidence to conclude that the mother suffered from a permanent incompetence, and, as a result, we cannot say that it erred in so concluding.
Howard also contends that the trial court erred when it concluded that the mother’s diagnosis of dementia precluded any argument from him that the mother could have experienced a lucid interval when she executed the deed. We agree.
Because the trial court concluded that the mother suffered a permanent incompetence, the burden shifted to Howard to prove that the mother was lucid at the time she executed the September 2007 deed. Ex parte Chris Langley Timber & Management, Inc., 923 So.2d at 1105. Although Howard set forth such evidence in the form of the testimony of the attorney and the secretary involved in the transaction that the mother was fully competent at the time she executed the September 2007 deed, the trial court, in its judgment, disregarded that evidence by stating: “[Howard’s] attorney pointed out that patients with chronic dementia may have better days and worse days, but since a baseline dementia is always present, such would seem to preclude any argument by [Howard] that the [September 2007] deed could have been executed during a ‘lucid interval.’ ” Our review of the medical testimony, however, does not support the trial court’s conclusion in that regard.
At no point in his deposition did Dr. Sinha testify that the mother’s .chronic dementia prevented her from having a lucid interval. Indeed, Dr. Sinha refused to opine that the mother had not retained the mental capacity, despite her diagnosis of chronic dementia, to convey her house to Howard. The mother’s medical records likewise fail to disclose any evidence supporting the trial court’s conclusion that the mother’s diagnosis of chronic dementia, standing alone, precluded Howard from contending that she had experienced a lucid interval at the time she executed the deed. Finally, neither the testimony of Roger nor the testimony of Sherry support the conclusion of the trial court that the mere fact the mother was diagnosed with chronic dementia, ipso facto, prevented her from ever experiencing a lucid interval.
Because the evidence of record does not support the trial court’s conclusion that the mother’s chronic dementia precluded the possibility that she could have been lucid at the time that she executed the deed, the trial court’s judgment is due to be reversed and the cause remanded. On re *224 mand, the trial court should consider the remaining evidence of record to determine whether or not that evidence supports a finding that the mother, at the time she executed the September 2007 deed, was experiencing a lucid interval such that she was competent to execute the September 2007 deed.
Roger’s request, on appeal, for an award of an attorney fee on behalf of the mother’s estate is denied.
REVERSED AND REMANDED.
PITTMAN, BRYAN, and THOMAS, JJ., concur.
MOORE, J., concurs in the result, without writing.

. The record reflects that Howard is deaf.

2. Apparently, the trial court is referring to the September 2007 deed, the second deed the mother executed. The evidence at trial focused on that deed. On appeal, the validity of that deed is the only issue presented.