MOORE, Chief Justice.
State Farm Fire and Casualty Company appeals from an adverse judgment entered on a jury verdict in the Morgan Circuit Court in favor of homeowner and policyholder Shawn Brechbill on his claim of “abnormal” bad-faith failure to investigate an insurance claim. We reverse the trial court’s judgment and remand.

I. Facts and Procedural History

On September 7, 2007, Brechbill purchased a 3-story, 80-year-old house in Lacey Springs. One month before closing on the purchase, Brechbill hired Allan McCrispin of McCrispin, Inc., a home-inspection company, to inspect the house. McCrispin did not note any significant cracking around the interior door frames. McCrispin noted some floor squeaking, as is typical for wood floors in older homes, but he saw no evidence of long-term settling of the house.
On September 11, 2007, a State Farm employee inspected Brechbill’s house to verify that it met State Farm’s underwriting requirements. State Farm’s underwriting file on Brechbill’s house indicated “yes” to the following question: Does the “applicant dwelling meet all homeowner underwriting guide requirements?” The underwriting file also reported “no unre-paired damage.” At all relevant times, Brechbill’s home was insured by State Farm.
In his complaint, Brechbill alleged as follows:
“On January 29, 2008, Brechbill’s house suffered damage due to a windstorm. On that date, high winds struck the house. An anemometer on the roof measured wind speed at approximately 59 miles per hour. The winds damaged the roof and racked the structure of the residence causing interior walls to crack and buckle and other damage. Interior damage and damage to the shingle roof were visible after the event.”
Brechbill described the events of the storm as follows. “It was literally shaking the house.... It was shaking the windows ... there was so much banging — there was banging and popping in the house.... The house was shaking so violently — I had a computer on the desk — the screen ... was shaking so bad it was actually walking across the desk.” Brechbill also stated that “the house was rocking.”
State Farm designated the windstorm that occurred on January 29, 2008, as a state-wide catastrophe due to the high number of insurance claims. State Farm’s declaration of a “catastrophe” was based on the number of claims, not the severity of the claims. In north Alabama alone about 300 State Farm insurance claims were submitted.
Brechbill alleged that in the days after the windstorm he noticed that the wall between the master bedroom and the dressing room was buckled and displaced, that the floor squeaks had become widespread, that a door frame had become dislodged, and that cracking started to appear in the drywall. Brechbill also alleged that the cracks in the drywall were not present when he purchased the house or at any time before the January 29 windstorm. *251 Brechbill alleged that immediately after the storm his house was noticeably more drafty and that interior blinds would move with the wind.
On March 31, 2008, Brechbill submitted a claim to State Farm for payment based on the wind damage. State Farm insurance adjuster Keith Fry inspected Brech-bill’s house on April 21, 2008. Fry found exterior damage to the roof shingles and interior damage consisting of cracked drywall and separated door jams. Fry concluded the exterior damage to the roof shingles was covered by Brechbill’s insurance policy and issued payment for roof repairs. Fry’s inspection included a photograph of drywall cracking above a door casing. Fry suggested that State Farm retain an engineer to determine the cause of the interior damages.
State Farm retained Phillip Chapski of Cerny & Ivey Structural Engineers, Inc., who inspected Brechbill’s residence on April 24, 2008. Chapski’s report, dated May 5, 2008, described his inspection as an “engineering evaluation ... to assess the structural integrity of the residence.” Brechbill was present during this investigation and provided Chapski with background information, which included floor drawings apparently prepared by Brech-bill. Chapski’s report states: “A visual inspection was performed only. There were no invasive or destructive materials investigations, or laboratory testing performed at the site. This report is limited in scope and based on investigative information gathered before, during, and after the site investigation.” Chapski evaluated whether “a wind storm affect[ed] the structural integrity of the residence and if not, what caused the damage.” Chapski’s report indicates he performed measurements “in the field” as part of his investigation.
From Chapski’s visual inspection of the attic, he observed no cracking, misalignment, or apparent settlement or displacement of the wood-framing system supporting the roof structure. From his measurements and review of Brechbill’s drawings, Chapski also concluded that the interior load-bearing walls of the residence were not properly aligned with one another, thus creating loading eccentricities and differential stresses and movements within the residence. Chapski observed cracking of the drywall between the master bedroom and dressing room and in the back bedroom, but he concluded that the cracking of the drywall was limited and not widespread.
Chapski’s report featured the following conclusions:
“1) The cracking of the [Sjheetrock and the squeaking of the floors as noted and identified was caused by long-term movement and settlement of the residence. The long-term movement and settlement would have been considered normal and typically occur[ ] as the residence ages and matures over time and [are] a function of a combination of factors influenced by the normal long-term aging, deterioration, and settlement of the building systems and local weather conditions, such as wind, rain, snow, and the freeze thaw cycle.
“2) Another factor that influenced the long-term movement and settlement and the initial cracking was the design, framing, and construction methods used to construct the residence especially the layout of the floor systems above the first floor level. The tall and exposed exterior walls and the wood framing methods used to construct the interior walls stressed the wood framing and support systems resulting in visible cracking of certain interior [Sjheetrock walls.
*252 “3) It is our opinion that the problems with the existing roof covering are considered long-term issues caused from a roof covering that had exceeded its useful life cycle.
“4) It is our opinion that the squeaking floors most probably were an original construction issue.
“5) It is our opinion that the reported moving or ‘racking’ and audible noises heard during the high winds was considered an expected occurrence given the location, size, layout, and construction of the residence. Over time, normal aging and wear will weaken the building systems exacerbating the problem.”
Based on Chapski’s findings, State Farm representative Heather Woods determined that the interior damage reported by Brechbill was not covered under Brech-bill’s homeowner’s insurance policy. Woods sent a letter to Brechbill citing two reasons for State Farm’s denial:
“We do not insure for any loss to the property ... which ... occurs as a result of any combination of ... wear, tear, ... deterioration, inherent vice, latent defect ... settling, cracking, shrinking, bulging, or expansion of ... walls, floors, roofs, or ceilings.
“We do not insure under any coverage for any loss consisting of ... defect, weakness, inadequacy, fault or unsoundness in: ... siting ... design, specifications, workmanship, construction, grading, compaction; materials used in construction or repair; or maintenance.”
Woods also sent Chapski’s report to Brechbill and told him he could get his own engineer to evaluate the interior damage.
Brechbill disagreed with Chapski’s conclusions. According to Brechbill, Chapski did not verify any of the dimensions or measurements of the house during his investigation, nor did he directly access the attic, other than performing a visual inspection by sticking his head into the attic-access hole. On May 15, 2008, Brechbill called Chapski to discuss his conclusion that the interior damage was caused by long-term settling. Chapski told Brechbill that this was a typical situation where the damage had been there before the event but had gone unnoticed.
On May 28, 2008, Brechbill called Bert Myers, a State Farm representative, and explained his concern that Chapski had not based his opinion on the specific facts of the case and had ignored facts that the house did not have the issues he was complaining of just a few months before the windstorm. Myers disputed Brechbill’s conclusions.
After Chapski’s inspection, Brechbill had McCrispin, who had inspected the house at the time Brechbill purchased it, inspect the house to “determine if items have/are changing over time in excess of expected values.” As a result, McCrispin issued a second report in June 2008 in which he noted: “In looking at these areas there does appear to have been changes since the original inspection.” McCrispin’s second report identified four areas that had changed since his original inspection four months before the windstorm. On the main floor, the wall separating the living room and kitchen had some “give” in the floor boards “that appears to have increased since the original inspection.” On the main floor, there was a crack at the bottom corner on the driveway-side window that was not present at the original inspection. Also on the main floor, McCrispin noted that “it appears the trim has popped free from the door frame.” In the master dressing room, McCrispin noted a crack above the corner of the doorway. McCrispin did not notice any sign of the exterior siding buckling or moving.
*253 McCrispin’s second report indicated that the “give” or sag in the floorboards near the wall separating the main-floor kitchen and living room was a result of original construction.
On July 17, 2008, Brechbill met with State Farm representatives Myers and Woods and provided them with McCris-pin’s initial home-inspection report from 2007 and the follow-up report from June 2008. Myers indicated that Chapski would reassess the areas McCrispin had identified in his follow-up report. Woods asked Chapski to review Brechbill’s concerns and McCrispin’s second report and to consider five specific areas:
“1. Plywood roof decking is moving and splitting causing a 5 to 6 ft. crack in roof and shingles. Nails are popping up out of the roofing system also.
“2. Cracking/Buckling/Splitting above and below door and window frames. Master dressing room crack/buekle/split is one area in question.
“3. Squeaking and softness of floors.
“4. Movement and racking of the house frame.
“5. Do you think the wind storm contributed to these damages?”
Chapski reviewed McCrispin’s reports, completed a second inspection of Brech-bifl’s residence, and submitted his second report to State Farm on July 29, 2008. His findings and conclusions remained the same. Chapski’s second report contains the following statements regarding his subsequent research about wind-speed data gathered 10 miles from Brechbill’s house.
“Wind data was reviewed from the weather station at the Redstone Arsenal Airport. The Redstone Arsenal Airport was located approximately 10 miles from the subject site.... The wind data collected at the airport would be considered relevant with respect to the subject site and area. As documented from the published data generated at the airport for the time frame of January 28, 29, 30, and 31, 2008, the maximum wind velocity in wind gust recorded for the period researched was 33 miles per hour, which occurred on Tuesday January 29, 2008 at approximately 2:55 pm.”
Chapski opined:
“The conditions and damage[] as inspected and observed were not caused by the heavy winds that reportedly occurred on or about January 29, 2008. Documentation of the wind data as recorded at the Redstone Arsenal Airport indicated no strong winds or precipitation had occurred during that time frame in the general area. All recorded wind speeds were deemed normal and that no strong or damaging wind speeds had occurred.”
Chapski’s second report evaluated McCris-pin’s initial report as follows:
“It was stated in the report that the siding was in generally good condition and that no current sign of buckling or movement was observed. In our opinion, this indicated that damaging movement or racking of the frame at the residence had not occurred.... ”
After discussing Chapski’s second report with Brechbill, Heather Woods sent a second denial letter to Brechbill. The second denial letter gives the same two reasons State Farm provided in the first denial letter. However, State Farm’s second denial letter added a third reason for denying Brechbill’s claim:
“We do not insure under any coverage for any loss which would not have occurred in the absence of one or more of the following excluded events ... Earth movement, meaning the sinking, rising, shifting, expanding, or contracting of earth ... Earth movement includes but *254 is not limited to ... subsidence, erosion, or movement resulting from improper compaction, site selection or any other external forces. Earth movement also includes volcanic explosion or lava flow.”
In August 2008, Brechbill hired Dr. William Payne of Payne Home Inspections, Inc., to conduct an investigation of the structure. Payne also assessed Chapski’s reports and State Farm’s conclusions. Payne concluded generally that “[t]he conclusions from the consulting engineers are based on questionable logic and incomplete research.” He explained:
“Neither report from the consulting engineering firm addressed the conditions of the house on the date of the inspection. The conclusions of both reports relied on suppositions of the engineer not the conditions of the house at the time of his inspection.
“The engineer assumed, without justification, the cracks to be in existence before the wind event.
“The consulting engineer incorrectly assumed the damaged walls were load bearing.... The conclusions from the engineering firm based on the assumption the walls are load bearing are incorrect.
“The wind speeds noted in the second report are based on a weather condition from a location that was not recording weather data at the time the event was occurring at your home.
“The consulting firm made serious errors in inspecting the house and investigating the events surrounding the occurrence of damage to your house.
“The consulting firm ignored relevant information from an independent source (Home Inspector) and from your measurements at the time of the event.
“The unusual wind load caused excessive movement of the framing and caused the interior cosmetic damage to occur.... I believe the wind load of January 29, 2008, caused the connections between the framing members to fail. Because the connections no longer properly resist the applied horizontal loads, the house moves excessively.”
On December 9, 2009, Brechbill sent State Farm the results of Payne’s engineering report and a copy of a report Brechbill had himself prepared. Myers again met with Brechbill and forwarded the two new reports to Chapski for analysis and review. Chapski then prepared a third supplemental report of January 15, 2010, on causation of damage. Most of Chapski’s original conclusions did not change. His observations about wind speed, however, did change. Chapski’s third report found:
“Based upon review of the information provided by Mr. Brechbill and review of other local meteorological data, it appears that the structure was affected by long-term winds in the range of 55 mph to 65 mph. Cerny & Ivey does not believe the 60 mph wind event was ‘unusual’ or that horizontal loads resulting from that wind were ‘excessive.’ ”
On January 28, 2010, Brechbill sued State Farm, alleging breach of contract, “normal” bad-faith failure to pay, and “abnormal” bad-faith failure to investigate. After filing its answer, State Farm filed a motion for partial summary judgment on Brechbill’s claims of “normal” bad-faith failure to pay and “abnormal” bad-faith failure to investigate. On October 7, 2010, the trial court granted State Farm’s motion for a partial summary judgment as to Brechbill’s claim for “normal” bad faith and denied State Farm’s motion as to “abnormal” bad faith. The trial court’s order reads in pertinent part:
“It appears to the Court that Brechbill has presented no serious opposition to *255 State Farm’s argument that his normal bad faith claim is not supported by substantial evidence. He has created no genuine issue of material fact about whether or not State Farm had a reasonably legitimate or arguable reason for refusing to pay the claim on August 7, 2008. State Farm is entitled to a judgment as a matter of law on Brech-bill’s normal bad faith claim.”
As to the “abnormal” bad-faith claim, the trial court stated:
“The Court cannot say with a reasonable degree of certainty, based on the record before it, that State Farm has carried its burden to make a prima facie showing that it marshaled all the facts necessary for it to make a good faith coverage determination as to Brechbill’s interior damage claim; that it adequately investigated all areas of damage related to the claimed loss; that it adequately investigated whether or not the January 29, 2008 wind event caused the loss as claimed by Brechbill; that it properly and adequately investigated the condition of the interior of Brechbill’s home before January 29, 2008, especially in view of its retained engineer’s opinions that the interior damage had occurred over a long period of time and was caused by forces or construction practices that predated the claimed wind event; and that it properly subjected Brechbill’s claim to a reasonable cognitive review or evaluation before denying the claim on August 7, 2008. In arriving at its foregoing conclusions, the Court finds that the Alabama Supreme Court’s reasoning and holdings in Jones [v. Alfa Mutual Insurance Co.], 1 So.3d [23] at 34-37 [ (2008) ], are persuasive, if not controlling.”
The trial court denied State Farm’s motion to reconsider the denial of the summary judgment on the “abnormal” bad-faith claim. State Farm sought certification for a permissive appeal from the trial court, which the trial court also denied. In the order denying State Farm’s request for a permissive appeal pursuant to Rule 5, Ala. R.App. P., the trial court observed, in pertinent part:
“Until filing its Motion for Certification [for a permissive appeal], the defendant has not created an issue or presented an argument that the granting of a summary judgment on the plaintiff’s ‘normal’ bad faith claim necessarily would require the Court to grant a summary judgment on the plaintiffs separate ‘abnormal bad faith’ claim. Moreover, it appears to be settled law that for a plaintiff to survive a motion for summary judgment on a ‘normal’ bad faith claim, his underlying breach of contract claim must be so strong that he would be entitled to a preverdict judgment as a matter of law. Shelter Mut. Ins. Co. v. Barton, 822 So.2d 1149 (Ala.2001). Because of the swearing match between the defendant’s expert and the plaintiffs expert as to the cause of the plaintiffs interior damage to his home, the plaintiff in the case at bar would not be entitled to a preverdict judgment on his breach of contract claim as a matter of law. For this reason, the Court granted the defendant’s Motion for Partial Summary Judgment as to the plaintiffs ‘normal’ bad faith claim.
“In ‘abnormal bad faith’ cases, however, the predicate of a preverdict judgment as a matter of law on the plaintiffs breach of contract claim is not required. White v. State Farm, Fire & Cas. Co., 953 So.2d 340 (Ala.2006); Employees’ Benefit Ass’n v. Grissett, 732 So.2d 968 (Ala.1998); Jones v. Alfa Mut. Ins. Co., 1 So.3d 23 (Ala.2008). Given this distinction between the predicates for getting a ‘normal’ versus an ‘abnormal’ bad faith claim to a jury, the Court finds no *256 controlling question of law on which there is substantial ground for a differ-of
The trial began on November 14, 2011. At the close of Brechbill’s case, State Farm moved unsuccessfully for a judgment as a matter of law. At the close of all the evidence, State Farm again filed a motion for judgment as a matter of law, which the trial court denied.
On November 22, 2011, the jury returned a verdict for Brechbill and awarded him $150,000 in compensatory damages on the breach-of-contract claim and $150,000 on the “abnormal” bad-faith-failure-to-investigate claim ($100,000 in compensatory damages and $50,000 in punitive damages). After the verdict, State Farm renewed its motion for a judgment as a matter of law and filed a motion for a new trial. State Farm’s posttrial motions were denied by operation of law pursuant to Rule 59.1, Ala. R. Civ. P. The trial court thereafter entered an order purporting to deny State Farm’s posttrial motions on March 26, 2012. On April 30, 2012, State Farm timely appealed the adverse judgment on the “abnormal” bad-faith claim but did not appeal the judgment on the breach-of-contract claim.

II. Standard of Review

This Court’s standard of review for a ruling on a judgment as a matter of law is “ ‘materially indistinguishable from the standard by which we review a summary judgment.’” Webb Wheel Prods., Inc. v. Hanvey, 922 So.2d 865, 870 (Ala. 2005) (quoting Hathcock v. Wood, 815 So.2d 502, 506 (Ala.2001)). “We must decide whether substantial evidence was presented to the jury, which, when viewed in the light most favorable to [the nonmov-ant], would warrant a jury verdict in [the movant’s] favor.” 922 So.2d at 870. Our standard of review for a ruling on a summary-judgment motion is well settled:
“ ‘ “[W]e utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,” Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988), and whether the movant was “entitled to a judgment as a matter of law.” Wright v. Wright, 654 So.2d 542 (Ala. 1995); Rule 56(c), Ala. R. Civ. P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmov-ant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989). Evidence is “substantial” if it is of “such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” Wright, 654 So.2d at 543 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant.’ ”
Presldtt v. Lyons, 865 So.2d 424, 426-27 (Ala.2003) (quoting Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala.1997)).

III. Analysis

The issue in this appeal is whether the trial court, after finding that State Farm had a reasonably legitimate or arguable reason for refusing to pay Brechbill’s claim at the time of the August 7, 2008, denial, erroneously denied State Farm’s motion for a judgment as a matter of law on Brechbill’s claim of “abnormal” bad-faith failure to investigate, which we will refer to as the bad-faith-refusal-to-investigate *257 claim.[1] When this Court in 1981 adopted the tort of bad faith in regard to the failure to pay an insurance claim, it held, “an actionable tort arises for an insurer’s intentional refusal to settle a direct claim where there is either ‘(1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal.’ ” Chavers v. National Sec. Fire & Cas. Co., 405 So.2d 1, 7 (Ala.1981). This tort has four elements plus a conditional fifth element, as follows:
“(a) an insurance contract between the parties and a breach thereof by the defendant;
“(b) an intentional refusal to pay the insured’s claim;
“(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
“(d) the insurer’s actual knowledge of the absence of any legitimate or arguable reason;
“(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer’s intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.”
National Sec. Fire & Cas. Co. v. Bowen, 417 So.2d 179,188 (Ala.1982).
State Farm argues that Brechbill’s bad-faith-refusal-to-investigate claim cannot proceed as a matter of law because the trial court expressly found that State Farm had a reasonably legitimate or arguable reason for refusing to pay the claim at the time of its denial. State Farm cites our holding in Weaver v. Allstate Insurance Co., 574 So.2d 771, 774 (Ala.1990), as follows:
“With regard to Weaver’s allegation that Allstate intentionally failed to adequately investigate the accident, we agree with the trial court that no triable issue was presented on this issue, because we hold that Allstate’s investigation established a legitimate or arguable reason for refusing to pay Weaver’s claim, which is all that is required.”
(Emphasis added.) State Farm notes that bad faith is a single tort, not two torts: that is, bad-faith refusal to investigate is the last element in the original articulation of the tort of bad-faith refusal to pay.
Brechbill, however, argues that a bad-faith-refusal-to-investigate claim can proceed to the jury even when evidence of bad-faith refusal to pay is insufficient to survive a judgment as a matter of law, citing Jones v. Alfa Mut. Ins. Co., 1 So.3d 28 (Ala.2008) (plurality opinion). Brechbill maintains, contrary to State Farm’s assertion, that there are two types of bad-faith claims. He quotes Employees’ Benefit Ass’n v. Grissett, 732 So.2d 968 (1998):
“[A] plaintiff has two methods by which to establish a bad-faith refusal to pay an insurance claim: he or she can prove the requirements necessary to establish a ‘normal’ case, or, failing that, can prove that the insurer’s failure to investigate at the time of the claim presentation procedure was intentionally or recklessly omissive.”
Id. at 976 (emphasis added).
As a preliminary matter, we agree with State Farm that there is only one tort of bad-faith refusal to pay a claim, not two “types” of bad faith or two sepa *258 rate torts. Since Chavers, this Court has referred to this tort in the singular:
“[A]n actionable tort arises for an insurer’s intentional refusal to settle a direct claim where there is either ‘(1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal.’ ”
405 So.2d at 7. Even the quote from Gris-sett to which Brechbill refers discusses two methods “to establish a bad-faith refusal to pay an insurance claim,” recognizing the singularity of the tort, albeit with different options for proof thereof. We have repeatedly held that the tort of bad-faith refusal to pay a claim has four elements— (a) a breach of insurance contract, (b) the refusal to pay claim, (c) the absence of arguable reason, (d) the insurer’s knowledge of such absence — with a conditional fifth element: “(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer’s intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.” Bowen, 417 So.2d at 188. Thus, for the tort of bad-faith refusal to pay, “[r]equirements (a) through (d) represent the ‘normal’ case. Requirement (e) represents the ‘abnormal’ case.” Grissett, 732 So.2d at 976. But the tort has always been one.
Regardless of whether the claim is a bad-faith refusal to pay or a bad-faith refusal to investigate, the tort of bad faith requires proof of the third element, absence of legitimate reason for denial: “Of course, if a lawful basis for denial actually exists, the insurer, as a matter of law, cannot be held liable in an action based upon the tort of bad faith.” Gulf Atlantic Life Ins. Co. v. Barms, 405 So.2d 916, 924 (Ala. 1981) (emphasis added). As we held in Weaver, where the “[insurer’s] investigation established a legitimate or arguable reason for refusing to pay [the insured]’s claim, [that] is all that is required.” 574 So.2d at 774. See also Bowers v. State Farm Mut. Auto. Ins. Co., 460 So.2d 1288, 1290 (Ala.1984) (“[W]here a legitimate dispute exists as to liability, ... a tort action for bad faith refusal to pay a contractual claim will not lie.”).
In the present case, the trial court’s order ruling on the motion for a partial summary judgment states:
“Brechbill has presented no serious opposition to State Farm’s argument that his normal bad faith claim is not supported by substantial evidence. He has created no genuine issue of material fact about whether or not State Farm had a reasonably legitimate or arguable reason for refusing to pay the claim on August 7, 2008.”
(Emphasis added.) In its order denying State Farm’s request for a permissive appeal, the trial court explained: “Because of the swearing match between the defendant’s expert and the plaintiffs expert as to the cause of the plaintiffs interior damage to his home, the plaintiff in the case at bar would not be entitled to a preverdict judgment on his breach of contract claim as a matter of law.” Because the trial court’s ruling eliminated the third element of bad-faith refusal to pay, Brechbill’s claim relying on the fifth element, i.e., that State Farm “intentionally failed to adequately investigate” the claim, must fail. Weaver, 574 So.2d at 774. The existence of an insurer’s lawful basis for denying a claim is a sufficient condition for defeating a claim that relies upon the fifth element of the insurer’s intentional or reckless failure to investigate. The trial court’s summary judgment on the third element of bad faith established the law of the case and should have foreclosed fur *259 ther litigation of that claim. Belcher v. Queen, 39 So.3d 1023,1038 (Ala.2009).
The Jones case, relied upon by the trial court and Brechbill to permit the bad-faith-refusal-to-investigate claim to proceed, is distinguishable. In Jones, we affirmed a summary judgment for Alfa Mutual Insurance Company on the Joneses’ “normal” bad-faith-refusal-to-pay claim and found that Alfa’s structural engineer’s “report creates a question of material fact that would preclude the Joneses from receiving a preverdict judgment as a matter of law on the underlying breach-of-contract claim.” Jones, 1 So.3d at 34. We also concluded, in a portion of the decision joined by a plurality, that the following facts, taken as a whole, created a jury question on the bad-faith-refusal-to-investigate claim:
“After Hurricane Opal, Alfa never investigated any records it had of the condition of the Joneses’ house before the hurricane. The record reflects that Alfa never contacted a realtor who visited the Joneses’ house three days before Hurricane Opal made landfall, even though, according to Harold Jones, Bradshaw had inquired about purchasing the Joneses’ residence. Alfa never inquired of the Joneses as to who would have seen their house before Hurricane Opal and never attempted to interview anyone who may have visited the Joneses’ house before Hurricane Opal. Alfa never considered its own ‘rewrite’ inspection of the Joneses’ house, including photographs of the exterior of the house and never inquired of Sanders, its own employee, as to the condition of the Joneses’ house when he conducted the ‘rewrite’ inspection, even though Sanders testified that he did not recall seeing any cracks in the interior or exterior walls of the Joneses’ house when he conducted the ‘rewrite’ inspection three months before Hurricane Opal.”
1 So.3d at 36-37. Likewise, Brechbill asserts that State Farm never considered “before and after” evidence from its own insurance agent, from real-estate agents, from the prior owner, and did not speak to McCrispin or anyone else who may have seen the house before the windstorm.
In Jones, evidence for the insurer’s denial was gathered after the denial was made, whereas here a debatable reason for State Farm’s denials existed at the time of the denials. See, e.g., Pyun v. Paul Revere Life Ins. Co., 768 F.Supp.2d 1157, 1171-72 (N.D.Ala.2011) (holding that because “Met Life had a reasonably debatable reason for denying Plaintiffs claim at the time of its denial of Plaintiffs claim-[, it] is entitled to summary judgment on Plaintiffs extraordinary bad-faith claim”).
State Farm may or may not have perfectly investigated (or reinvestigated) Brechbill’s claim to his satisfaction, but perfection is not the standard here. “Alabama law is clear: ... regardless of the imperfections of [the insurer’s] investigation, the existence of a debatable reason for denying the claim at the time the claim was denied defeats a bad faith failure to pay the claim.” Weaver, 574 So.2d at 775 (quoting State Farm Fire & Cas. Co. v. Balmer, 891 F.2d 874, 877 (11th Cir.1990)). This fact, present in Weaver and in the instant case, was nonexistent in Jones.
The facts before us do not rise to the level of bad faith, dishonesty, self-interest, or ill will inherent in bad-faith conduct. Even if State Farm improperly omitted some aspects of a complete investigation, “more than bad judgment or negligence is required in a bad-faith action.” Singleton v. State Farm Fire & Cas. Co., 928 So.2d 280, 287 (Ala.2005). “Bad faith, then, is not simply bad judgment or negligence. It imports a dishonest purpose and means a breach of known duty, i.e., good *260 faith and fair dealing, through some motive of self-interest or ill will.” Gulf Atlantic Life Ins. Co. v. Barnes, 405 So.2d 916, 924 (Ala.1981). A bad-faith-refusal-to-investigate claim cannot survive where the trial court has expressly found as a matter of law that the insurer had a reasonably legitimate or arguable reason for refusing to pay the claim at the time the claim was denied. Because State Farm repeatedly reviewed and reevaluated its own investigative facts as well as those provided by Brechbill, it is not liable for a tortious failure to investigate.
We reverse the judgment on the bad-faith-refusal-to-investigate claim and remand the case to the trial court for proceedings consistent with this opinion.
REVERSED AND REMANDED.
STUART, BOLIN, PARKER, and MAIN, JJ., concur.
MOORE, C.J., and MURDOCK, J., concur specially.
BRYAN, J., concurs in the result.

. Instead of the confusing terms "normal’' and "abnormal” bad faith, this opinion will use the more descriptive terms "bad-faith refusal to pay” and "bad-faith refusal to investigate,” respectively.